**MH DAVIS ESTATE OIL CO., INC., and West Chester Land Corporation, Petitioners,**

v.

**UNDERGROUND STORAGE TANK INDEMNIFICATION BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 5, 2001.
Decided Dec. 14, 2001.

Neil S. Witkes, Bala Cynwyd, for petitioner.

Preston M. Buckman, Harrisburg, for respondent.

Before COLINS, J., McGINLEY, J., and McCLOSKEY, Senior Judge.

McGINLEY, Judge.

M.H. Davis Estate Oil Co., Inc. (Davis) and West Chester Land Corp. (West Chester) (collectively, Petitioners) seek review of an order of the Underground Storage Tank Indemnification Board (Board) that denied Petitioners' coverage under the Underground Storage Tank Indemnification Fund (USTI Fund).

The Presiding Officer made the following pertinent findings of fact [1]:

1. . . . Davis is the distributor of gasoline for the West Chester Citgo retail sales facility . . . .

2. Davis is also the operator of the Facility and of the underground storage tanks located at the Facility.

. . . .

4. . . . West Chester is the owner of the Facility.

. . . .

7. West Chester and Davis . . . are separate entities.

8. The Facility sells gasoline and diesel fuel to the public. The retail sales operations are adjacent to a bulk storage facility servicing a home heating oil operation.

9. There have been a total of eighteen (18) storage tanks at the Facility. Seventeen of those tanks are underground; one tank was above ground, was used to store kerosene, and has since been taken out of service.

10. Davis is the operator of the seventeen underground storage tanks and was

1. The Presiding Officer acknowledged that his Findings of Fact are almost verbatim of the stipulation of facts entered into between the parties.

the operator of the above ground tank until it was taken out of service.

11. The underground storage tanks have been registered in accordance with the requirements of section 503 of the Storage Tank and Spill Prevention Act ... ("the Tank Act").

12. No permit is required under sections 501 and 504 of the Tank Act.

13. Since February 1, 1994, the date established by the Underground Storage Indemnification Board for the payment of fees required by section 705 of the Tank Act, through December 1999, West Chester has paid $62,304.93 in capacity fees to the Fund for underground storage tanks located at the Facility.

14. For the Facility, the following capacity fee payments were made:

| 1994 | $ 7,775.75 |
| 1995 | $16,628.88 |
| 1996 | $10,795.00 |
| 1997 | $ 6,475.[00] |
| 1998 | $ –0– |
| July 1999 | $18,470.30 |
| June 2000 | $ 960[.00]. |

15. Capacity fee invoices are sent in December and due in thirty days, or may be paid in twelve monthly installments over the course of the year.

16. Davis paid thousands of dollars in throughput fees for gasoline sold at the Facility.

17. *No capacity fees were paid for the Facility between September 23, 1997 and July 1999. Davis paid no throughput fees to the Fund between July 1997 and July 1999.* Prior to July 1997, Davis paid $689,013.32 in throughput fees for gasoline delivered at numerous locations at which Davis was the distributor, including throughput fees paid for gasoline delivered at the Facility. During the months January–July 1996, Davis overpaid throughput fees in the total amount of $80,000.00, which was applied as a credit against throughput fees due during the months September 1996–June 1997. (emphasis added).

18. By Amendment to Order dated May 28, 1999, the Pennsylvania Department of Environmental Protection ("DEP") found that Davis ... failed to pay or arrange for the payment of capacity and throughput fees to the [USTI] Fund.

19. As an additional condition for Davis, [and] West Chester ... to reopen operations at the Facility, the Amendment to Order added that payment of throughput and capacity fees be demonstrated.

20. *By letters dated July 20, 1999 Davis paid past due capacity fees and throughput fees. The [USTI] Fund does not currently dispute the amount of throughput fees paid by Davis. Davis has submitted throughput fee payments for 2000, and since July 20, 1999, has timely paid throughput fees to the [USTI] Fund.* (emphasis added).

21. *Davis demonstrated payment of the throughput fees and capacity fees to DEP's satisfaction, and DEP permitted Davis to reopen operations at the Facility.* (emphasis added).

22. The release that is the subject of the claim occurred after February 1, 1994, the date established by the Board for payment of the fee required by section 705(d) of the Tank Act.

23. *Davis first discovered a suspected release of product at the Facility in the Spring of 1999. Davis confirmed the suspected release in June 1999. At these times, the fees currently due had not been paid although the due date for the fees had passed.* (emphasis added)

24. *The claim was first reported to the [USTI] Fund by telephone on September 23, 1999.* (emphasis added).

25. *At the time the claim was reported to the [USTI] Fund, the fees required under section 705 of the Tank Act had been paid.* (emphasis added).

26. The [USTI] Fund's Claim Investigator denied the claim by letter dated January 26, 2000. At that time, the fees required under section 705 had been paid.

27. As of June 2000, the fees required under section 705 have been paid.

28. *The sole basis on which the [USTI] Fund denied the claim was that the throughput and capacity fees had not been paid at the time that the suspected release was discovered and confirmed.* (emphasis added).

Proposed Report and Recommendations of the Presiding Officer, September 28, 2000, Findings of Fact Nos. 1–2, 4, and 7–28 at 3–7.

The Presiding Officer recommended denial of coverage for a storage tank release discovered and confirmed by Petitioners while current fees were delinquent:

> Under the Tank Act, tankowners in essence pay for coverage by current payment of the fee and compliance with other requirements. You don't get what you don't pay for. Allowing fee payment only when needed for a claim would mean that a tankowner does not pay for coverage, but rather pays a processing fee for issuance of a reimbursement check. This absurd result was not intended by the General Assembly. The result is harsh for a participant which pays thousands of dollars in fees except for a window of time in which the claim is unearthed. However, this result is mandated by statute and is in the con-

trol of the participant paying or withholding the fee. It also is no less harsh than denying medical or automobile catastrophic loss coverage to the victim of medical malpractice or an automobile accident, something which has been upheld by the appellate courts.

Presiding Officer's Report and Recommendation at 19.

The Board adopted the Presiding Officer's Report and Recommendation and affirmed:

> [T]he Board finds that Section 706(2) was intended to assure that tank owners and operators have paid for coverage before a loss is incurred. Moreover, given that the Act's eligibility requirements are not overly taxing, it is certainly not unreasonable to require a tank owner or operator to have their fees paid before coverage is needed, not after the discovery of the loss.

The Board's Decision, March 30, 2001, at 16.

On appeal [2] Petitioners contend that the Board erred as a matter of law when it determined that Petitioners did not satisfy the eligibility requirements under Section 706(2) of the Storage Tank and Spill Prevention Act (Tank Act) [3], 35 P.S. § 6021.706(2). Petitioners assert that the Tank Act does not specifically provide that owner/operator fees must be current in order to be eligible for coverage at the time of a storage release or discovery of a release.

Section 705 (**Powers and duties of Underground Storage Tank Indemnification Board**) of the Tank Act, 35 P.S. § 6021.705(d) provides:

---

**2.** This Court's review is limited to a determination of whether the government agency violated constitutional rights, erred as a matter of law or whether its findings of fact are

supported by substantial evidence. 2 Pa.C.S § 704.

**3.** Act of July 6, 1989, P.L. 169, No. 32, *as amended.*

The board, by regulation, shall establish fees to be paid by the owner or operator, as appropriate, of the underground storage tanks. Fees shall be set on an actuarial basis in order to provide an amount sufficient to pay outstanding and anticipated . claims against the Underground Storage Tank Indemnification Fund in a timely manner. Fees shall also include an amount sufficient to meet all other financial requirements of the board. Fees shall be adjusted as deemed necessary by the board, but no more than once a year.

Section 706 (**Eligibility of claimants**) of the Tank Act, 35 P.S. § 6021.706 provides:

In order to receive a payment from the Underground Storage Tank Indemnification Fund, a claimant shall meet the following eligibility requirements:

(1) The claimant is the owner or operator of the tank which is the subject of the claim.

(2) *The current fee required under section 705 has been paid.*

(3) The tank has been registered in accordance with the requirements of section 503.

(4) The owner or operator has obtained a permit, if required under sections 501 and 504.

(5) *The claimant demonstrates to the satisfaction of the board that the release that is the subject of the claim occurred after the date established by the board for payment of the fee required by section 705(d).*

(6) Additional eligibility requirements which the board may adopt by regula-

tion. (emphasis added and footnotes omitted).

■ The question whether the plain language under Section 706(2) of the Tank Act requires that "current fee" must be paid at the time of discovery of the storage tank release has not been addressed by our Pennsylvania courts. However, our Pennsylvania Supreme Court has provided some insight concerning the rationale behind a similar statute.

In *Dellenbaugh v. Pennsylvania Medical Professional Liability Catastrophe Loss Fund,* 562 Pa. 558, 756 A.2d 1172 (2000), Arturo Azurin, M.D. (Dr. Azurin) performed abdominal surgery on Dora M. Dellenbaugh (Dellenbaugh). Following surgery, Dellenbaugh developed numerous complications that resulted in her death. Charles Dellenbaugh (Administrator) filed a malpractice action against Dr. Azurin and sought damages that could have exceeded the $200,000 basic coverage. The Medical Professional Liability Catastrophe Loss Fund (CAT Fund) [4] notified the Administrator that it would not provide coverage to Dr. Azurin. The reason for refusal was that Dr. Azurin had failed to pay his annual surcharges to the CAT Fund.[5] Before this Court, we concluded that pursuant to the Malpractice Act tort victims were entitled to compensation regardless of whether the surcharges were paid by the health care provider.

On appeal, our Pennsylvania Supreme Court reversed and noted:

The purpose of the Malpractice Act was set forth in 40 P.S. § 1301.102, which provides:

---

4. The CAT Fund is a Commonwealth agency responsible for providing statutory excess liability coverage in a medical malpractice action pursuant to the "Health Care Services Malpractice Act" (Malpractice Act), the Act of October 15, 1975, P.L. 390, *as amended,* 40 P.S. §§ 1301.701–1301.706.

5. 31 Pa.Code § 242.17(b) provides that "[a] health care provider failing to pay the surcharge or emergency surcharge within the time limits prescribed will not be covered by the Fund in the event of loss."

It is the purpose of this act to make available professional liability insurance at a reasonable cost, and to establish a system through which a person who has sustained injury or death as a result of tort or breach of contract by a health care provider can obtain a prompt determination and adjudication of his claim and the determination of fair and reasonable compensation.

While the second of the stated purposes is indeed to promote the 'determination of fair and reasonable compensation' for tort victims ... the other purpose, to wit ... is to 'make available professional liability insurance at a reasonable cost,' id. It is inherently contrary to the latter purpose to require the fund to cover claims made against those who have not paid their surcharges to the fund, for, by doing so, the fund would be required to increase surcharges assessed against complaint health care providers. *It would also undermine the financial integrity of the fund to pay claims for those who have ignored their responsibility to pay into the fund. We do not believe the legislature intended such a result.*

The Malpractice Act provides that 'the fund shall be funded by the levying of an annual surcharge on or after January 1 of every year on *all* health care providers entitled to participate in the fund.' 40 P.S. § 1301.701(e)(1) [emphasis in original]. Inasmuch as all providers are required to pay the surcharges, the clear and logical implication is that if a provider fails to pay his share, he may not participate in the coverage offered by the fund....

*To conclude that a provider can ignore the requirements of the Malpractice Act, yet reap the benefits thereof, is untenable. Further, when an insured is not covered for a loss, it is inconceivable that the claimant is nevertheless enti-tled to be paid by the carrier for that loss.* The court below, by holding the CAT Fund liable for such a loss, plainly erred.

We are not persuaded ... that the CAT Fund could pay the loss and then pursue Dr. Azurin to recoup any damages that the fund pays to appellee [Administrator]. *This would further drain assets of the fund where the likelihood of recovering such funds is low, and resources of the fund would have to be used to cover the cost of the collection ....* (emphasis added and cite omitted).

*Dellenbaugh,* 562 Pa. at 562–63, 756 A.2d at 1174–75.

Both the USTI Fund and the CAT Fund are statutory creatures which the General Assembly requires mandatory participation by those who will benefit by it. Also, both funds are remedial in nature and were created to protect the well-being of the citizenry of Pennsylvania. The USTI Fund provides coverage to storage tank owners to clean up storage tank releases that pose a significant health risk to the general public. The CAT Fund provides coverage to health care providers to compensate individuals that suffer serious or fatal injuries as a result of medical malpractice. Finally, remedies are available under both funds when the fees are delinquent. The USTI Fund provides for monetary penalties and ineligibility and the CAT Fund provides for suspension and revocation of the health care provider's license and ineligibility. It is fitting that this Court reach a conclusion regarding the USTI Fund that is consistent with the treatment afforded the CAT Fund.

■ Assuming arguendo, that this Court accepted Petitioners' interpretation of Section 706(2) of the Tank Act, the result would be that a claimant was eligible for retroactive coverage even where

there was a failure to make one payment or no payments at all so long as all fees due and owing were paid at the time the claim was submitted. Such an outcome would countenance a situation where coverage is provided after loss is incurred and prior to payment of fees, allowing tank owners and operators to pay fees at their leisure. Clearly, the General Assembly did not intend such a result where it specifically mandated the participation of underground storage tank owners and operators in the USTI Fund and where failure to do so would compromise the financial stability of the USTI Fund.

Accordingly, we affirm.

Judge COLINS dissents.

### ORDER

AND NOW, this 14th day of December, 2001, the order of the Underground Storage Tank Indemnification Board in the above-captioned matter is affirmed.