J. D. PICKENS (ESTATE OF
Jeannette SHERMAN),
Petitioner

v.

UNDERGROUND STORAGE TANK
INDEMNIFICATION BOARD,
Respondent.

Commonwealth Court of Pennsylvania.

Argued Nov. 15, 2005.
Decided Jan. 4, 2006.
As Amended Feb. 10, 2006.
Reargument Denied Feb. 21, 2006.

Alan A. Reuter, Philadelphia, for petitioner.

Traci M. Ribeiro, Philadelphia, for respondent.

BEFORE: PELLEGRINI, Judge, and LEAVITT, Judge, and KELLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

J.D. Pickens (Pickens) and the Estate of Jeannette Sherman (Estate) appeal from an order of the Underground Storage Tank Indemnification Board (Board) denying the Estate's eligibility under the Underground Storage Tank Indemnification Fund (Fund) because it did not pay the necessary tank fees pursuant to the Storage Tank and Spill Prevention Act (Tank Act) [1] for the years 1994 and 1995.

---

1. Act of July 6, 1989, P.L. 169, No. 32, *as amended*, 35 P.S. §§ 6021.101–6021.2104. The purpose of the Tank Act is to prevent the occurrence of storage tank releases "through the establishment of a regulatory scheme for the storage of regulated substances in new

The Estate owns the real estate located at 642 North 52nd Street, Philadelphia, Pennsylvania, and Pickens has been the lessee at all relevant times operating an automobile service station with attendant underground storage tanks. Pickens, as the registered owner and operator of the service station, first registered the underground storage tanks in 1990 with the Pennsylvania Department of Environmental Resources. On February 1, 1994, tank fees were established pursuant to Section 705(d) of the Tank Act, 35 P.S. § 6021.705(d).[2] These fees are established year to year to meet the anticipated claims. Tank fees were set in 1994 and 1995 at $100 per tank. The Fund mailed 10 invoices to Pickens from December of 1993 through December of 1996 requesting that he pay the mandated tank fees for the years 1994 and 1995. These invoices totaled $666.64, consisting of $300 in tank fees for 1994, $64.64 in penalties for those tank fees and $300 in tank fees for 1995. Neither Pickens nor the Estate paid those invoices. After the year 1995 (25 Pa.Code § 977.12), these fees were set by the Fund at "$0." No payment of any fee has ever been made by the Estate or Pickens into the Fund for which the Estate now seeks reimbursement.[3]

In February, 2002, the tanks on the property were excavated, a "release"[4] was found in and around the tanks, and the Estate submitted a claim to the Fund for remediation costs.[5] Because the Estate

and existing storage tanks and to provide liability for damages sustained within this Commonwealth as a result of a release and to require prompt cleanup and removal of such pollution and released regulated substance." 35 P.S. § 6021.102(b). The Fund was created to provide necessary monies to the Board "for the purpose of making payments to owners, operators and certified tank installers of underground storage tanks who incur liability for taking corrective action or for bodily injury or property damage caused by a sudden or nonsudden release from underground storage tanks and for making loans to owners as authorized by [the] [Tank Act]." 35 P.S. § 6021.704(a)(1).

2. Section 705(d) of the Tank Act, 35 P.S. § 6021.705(d), provides in relevant part: "The board, by regulation, shall establish fees to be paid by the owner or operator, as appropriate, of the underground storage tanks. Fees shall be set on an actuarial basis in order to provide an amount sufficient to pay outstanding and anticipated claims against the Underground Storage Tank Indemnification Fund in a timely manner. Fees shall also include an amount sufficient to meet all other financial requirements of the board. Fees shall be adjusted as deemed necessary by the board, but no more than once a year."

3. There are other fees known as "throughput fees." Also known as "gallon fees," throughput fees are assessed upon a tank owner or operator on regulated substances placed into an underground storage tank. 25 Pa.Code § 977.4. The fees are calculated by multiplying the number of gallons of regulated substance entering an underground storage tank by $.011. (For example, 10,000 gallons at $.011 per gallon equals $110). 25 Pa.Code § 977.12(b)(2). The Estate owed no throughput fees after 1995 as no deliveries to the tanks were made during any time period in which a throughput fee requirement was in effect.

4. The term "release" is defined by Section 103 of the Tank Act, 35 P.S. § 6021.103, as: "Any spilling, leaking, emitting, discharging, escaping, leaching or disposing from a storage tank into surface waters and groundwaters of this Commonwealth or soils or subsurface soils in an amount equal to or greater than the reportable released quantity determined under section 102 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, and regulations promulgated thereunder, or an amount equal to or greater than a discharge as defined in section 311 of the Federal Water Pollution Control Act (62 Stat. 1155, 33 U.S.C. § 1321) and regulations promulgated thereunder."

5. At the time the tanks were originally excavated and the release was discovered, the tanks were registered to Pickens. The tanks were then registered to the Estate in March

had not paid its tank fees for the years 1994 and 1995, the Fund's Managers denied its claim because Section 706(2) of the Tank Act, 35 P.S. § 6021.706(2),[6] makes claimants who had not paid the "current [tank] fee" ineligible for payment of remediation costs. The Estate requested a hearing before the Board contending that it was eligible for reimbursement because even though it never paid the tank fees for 1994 and 1995, it was current in its payment for the year 2002 as no fee was due. A Presiding Officer was appointed by the Board to hear the matter.

■ Finding the term "current fee" as used in the Tank Act to mean "all fees" owed, the Presiding Officer issued a Proposed Report and Recommendation (Report) recommending to the Board that the Estate's claim be denied. Even though

the term "current fee" was not defined by the Tank Act, the Presiding Officer reasoned that term had to include all past due fees because if a tank owner had to pay only the fee for the current year to remain eligible, it would cause tank owners not to pay past due fees which would threaten the financial stability of the Fund. This would be contrary to the legislative purpose of the Tank Act to have a financially sound Fund to ensure that harmful releases be remediated.[7] The Estate filed Exceptions to the Report, which the Board denied, and it adopted the Presiding Officer's Report as its own. This appeal followed.[8]

■ Noting that "current" is defined as "presently elapsing," "occurring in or existing at the present time" or "most recent,"[9] the Estate contends that the plain

2002. In spite of the fact that Pickens is the rightful claimant under the Tank Act, the Estate is pursuing the claim as the real party in interest because it spent money for the tank removal and was deemed liable for the response costs. The Fund did not challenge the Estate's standing to prosecute this appeal in Pickens' name.

6. Section 706 of the Tank Act, 35 P.S. § 6021.706, establishes the requirements for eligibility for claimants to receive payment from the Fund. Section 706 provides, in pertinent part:

In order to receive a payment from the Underground Storage Tank Indemnification Fund, a claimant shall meet the following eligibility requirements:

❊ ❊ ❊ ❊

(2) The *current fee* required under section 705 has been paid. (Emphasis added)

7. The Presiding Officer relied on *M.H. Davis Estate Oil Co., Inc. v. Underground Storage Tank Indemnification Board*, 789 A.2d 398 (Pa.Cmwlth.2001), for his rationale. In that case, an oil company had not paid its current throughput fees when it first discovered a suspected release of product. Shortly after the discovery of the release, it paid its past due throughput fees and sought reimbursement which the Fund denied. Rejecting the

oil company's argument that the "current fee" only had to be paid when payment was sought, not when the release was discovered, we held the "current fee" had to be paid at the time of release because to hold otherwise would allow tank owners to make fee payments only when a release was discovered, not when the fee was due, thus imperiling the financial stability of the Fund. We also rejected the notion that the Fund was like an insurance policy or that other enforcement mechanisms were available to collect past due fees, noting the Fund was not insurance, but a fund created by statute to provide payments to eligible tank owners, and that eligibility for coverage depended upon compliance with statutory requirements.

8. Our scope of review is limited to a determination of whether the government agency violated constitutional rights, erred as a matter of law or whether its findings of fact are supported by substantial evidence. *Southeast Delco School District v. Underground Storage Tank Indemnification Board*, 708 A.2d 881 (Pa.Cmwlth.1998).

9. The Tank Act does not define the term "current fee." *See* 35 P.S. § 6021.103. Absent a definition in the statute, the Statutory Construction Act requires words and phrases to

meaning of "current fee" as used in Section 706(2) of the Tank Act is that only the current year's fees have to be paid to be eligible for reimbursement, not "all fees" as the Board found. Because the non-payment of the tank fees for the years 1994 and 1995 are not current fees but past due fees, the Estate argues that the Board erred in finding that it was ineligible for reimbursement from the Fund.

Notwithstanding the adverse effect such an interpretation may have on the Fund's financial condition, if before us was the interpretation of the bare term "current fee," we would agree with the Estate that the term "current fee" only means the fee presently due and owing. However, Section 706(2) of the Tank Act does not just require that the "current fee" be paid, but also that "[t]he current fee required under section 705 has been paid." What is a "current fee" then, is what is owed under Section 705.

Along with providing who is responsible for the payment of fees and where the fees are to be paid, Section 705(e) of the Tank Act, 35 P.S. § 6021.705(e), also provides in relevant part:

> A person who fails or refuses to pay the fee or a part of the fee by the date established by the board may be assessed a penalty of 5% of the amount due which shall accrue on the first day of delinquency and be added thereto. Thereafter, on the last day of each month during which any part of any fee or any prior accrued penalty remains unpaid, an additional 5% of the then unpaid balance shall accrue and be added thereto.

What Section 705(e) of the Tank Act does, much like a credit card account, is to require the amount of the past due fee to be "rolled over" with interest and have a penalty added each month when a tank fee is not timely paid, making "all fees," a "current fee" owed to the Fund even though it represents the amount of fees assessed for previous years. Because Section 706(2) of the Tank Act conditions eligibility for reimbursement on the payment of the current fee required to be paid under Section 705(e), which makes "current" past due fees, the Board properly determined that the non-payment of tank fees for the years 1994 and 1995 makes the Estate ineligible for reimbursement of its remediation costs.

Accordingly, we affirm the order of the Board denying the Estate's exceptions and adopting the Presiding Officer's Report in full.

### ORDER

AND NOW, this *4th* day of *January,* 2006, the order of the Underground Storage Tank Indemnification Board dated January 14, 2005, is hereby affirmed.

DISSENTING OPINION BY Judge LEAVITT.

I respectfully dissent. The majority interprets "current fee," as used in Section 706(2) of the Storage Tank and Spill Pre-

be construed "according to rules of grammar and according to their common and approved usage." 1 Pa.C.S. § 1903(a); *see also Harris–Walsh, Inc. v. Borough of Dickson City,* 420 Pa. 259, 216 A.2d 329 (1966). According to *Webster's 11th Collegiate Dictionary,* "current" means "presently elapsing," "occurring in or existing at the present time" or "most recent." WEBSTER'S ELEVENTH COLLEGIATE DICTIONARY 306 (2004). The Statutory Construc-

tion Act states the "object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b).

vention Act (Tank Act),[1] to mean all fees ever assessed by the Underground Storage Tank Indemnification Fund against the owner of an underground storage tank from the inception of the program. This expansive interpretation makes "current" an adjective of no meaning. More importantly, this interpretation defeats the remedial purposes of the Tank Act.

To support the conclusion that "current fee" means all past due fees, the majority violates several rules of grammar and statutory construction principles.[2] First, it equates the singular term "fee" with its plural, "fees." Second, it renders "current" either surplusage or gives it a very strained rendition by equating "current" with "from the beginning of the program."

Third, the majority derives its expansive reading of "current fee" by avoiding the language in Section 705(d)[3] that supports only one conclusion: a "current fee" is the fee for the present annual coverage period.

Section 705(d) of the Tank Act authorizes the Board to establish fees as needed to fund the program. It is noteworthy that the fees are set for "an annual coverage period." 35 P.S. § 6021.705(d)(3). Further, fees are established on an actuarial basis to cover "outstanding and anticipated claims" as well as "anticipated expenses." 35 P.S. § 6021.705(d)(1). Each annual fee, therefore, is the amount needed to pay claims and expenses for the "annual coverage period." In this respect, the annual fee functions in the same way

---

**1.** Act of July 6, 1989, P.L. 169, *as amended,* 35 P.S. § 6021.706(2). It provides in pertinent part as follows:

> In order to receive a payment from the Underground Storage Tank Indemnification Fund, a claimant shall meet the following eligibility requirements:
>
> ❊ ❊ ❊
>
> (2) The current fee required under section 705 [35 P.S. § 6021.705] has been paid.

**2.** It is axiomatic that, in discerning legislative intent, "every statute shall be construed, if possible, to give effect to all of its provisions." 1 Pa.C.S. § 1921(a). Furthermore, "words and phrases shall be construed ... according to their common and approved usage." 1 Pa.C.S. § 1903(a). We may not disregard words in a statute that are clear and free from all ambiguity under the pretext of pursuing the spirit of the statute. 1 Pa.C.S. § 1921(b).

**3.** Section 705(d) provides:

> (d) Fees.—
> (1) The board, by regulation, shall establish fees to be paid by the owner, operator or certified tank installer, as appropriate, of underground storage tanks. *Fees shall be set on an actuarial basis in order to provide an amount* sufficient to pay outstanding and anticipated claims against the Underground Storage Tank Indemnification Fund in a timely manner. Fees shall also include an amount sufficient to meet all other financial requirements of the board. Fees shall be adjusted as deemed necessary by the board, but no more than *once a year.* The board shall *annually* evaluate the fee amount to determine if it is sufficient to meet the anticipated expenses of the fund and provide a copy of its evaluation to the Environmental Resources and Energy Committee of the Senate and the Conservation Committee of the House of Representatives. The board shall analyze the claims experience of storage tanks to determine which types of underground tanks or tank configurations result in less frequent leaks.
> (2) The owner or operator of an underground storage tank used to store heating oil, diesel fuel or other regulated substance as determined by the board shall pay a per gallon of tank *capacity fee.* The *capacity fee* shall be set on the same actuarial basis as is provided in subsection (d)(1).
> (3) In no case shall the owner or operator of an underground storage tank used for non-retail bulk storage or wholesale distribution of gasoline pay fees totaling more than $5,000 per tank in any *annual coverage period* for which fees are charged.
> (4) The owner or operator of an underground tank used to store diesel fuel on a farm for noncommercial purposes shall be required to pay the same fee as the owner or operator of an underground tank containing gasoline.

that an annual premium does in funding insurance for an annual policy period.

Section 705(e),[4] *inter alia,* authorizes the Board to assess monetary penalties against a tank owner or operator who fails to make timely payment of an assessed fee. On the "first day of a delinquency," a 5% monthly penalty begins to accrue; however, assessment of a penalty is not mandatory but, rather, discretionary. Section 705(e) does not empower the Board to revoke a participant's eligibility for non-payment of fees.[5] The Board's regulations do not authorize any penalty beyond the current year's unpaid fee.[6]

Here, the Board sent Pickens, who registered the tanks and leased the premises owned by the Estate, a tank fee of $300 for the "annual coverage period" of 1994.[7] When it was not paid on the due date of December 15, 1993, the Board began to assess a daily penalty. Thus, the August, September, October and November invoices steadily increased the 1994 fee from

35   P.S. § 6021.705(d) (emphasis added).

4.   Section 705(e) provides:
   **(e) Payment of fees.**—Fees established for the owner of the tank under subsection (d)(1) through (4) shall be paid by the owner of the tank unless a written agreement between the owner and the operator provides otherwise. Fees established for certified tank installers under subsection (d)(1) shall be paid to the Underground Storage Tank Indemnification Fund or to the intermediaries so designated by the board. Intermediaries located outside the territorial boundaries of this Commonwealth may collect and remit fees upon proof that a performance bond has been secured and maintained in an amount of $1,000,000. *A person who fails or refuses to pay the fee or a part of the fee by the date established by the board may be assessed a penalty of 5 of the amount due which shall accrue on the first day of delinquency and be added thereto.* Thereafter, on the last day of each month during which any part of any fee or any prior accrued penalty remains unpaid, an additional 5 of the then unpaid balance shall accrue and be added thereto. A financial institution holding a mortgage or security interest on property containing an underground storage tank may with the owner or operator request the board to notify the financial institution in the event the owner or operator does not pay the fees required by this section by the date specified by the board. Notice of nonpayment to the financial institution or payment of an owner or operator's fee shall not constitute the assumption of any corrective action liability on the part of a financial institution.
   35   P.S. § 6021.705(e).

5.   In fact, the only provision for revoking eligibility is for failing to cooperate in the settlement of claims. 25 Pa.Code § 977.32(c) provides "[l]ack of cooperation by the participant with the Fund or its investigators, attorneys, or agents may result in denial of the claim or cessation of further payments on a claim."

6.   The regulations promulgated by the Board do not include any penalty beyond the discretionary leveling of a 5% monthly penalty fee on the current year's unpaid fee. In my view, this is because allowing the Board to revoke eligibility for payment from the Fund on the basis of a fee unpaid in previous years would defeat the purpose of the Tank Act.

7.   There is no dispute that Pickens registered the tasks in question and was sent invoices for the 1994 and 1995 fees, which are at issue in this case. It is also undisputed that the Estate has been the record owner of the affected property at all pertinent times, most notably in 2002 when the release was discovered. Notwithstanding Pickens' designation as the claimant in this matter, the Board acknowledges that the real party in interest for payment of a remediation claim by the Fund is the Estate, since it is the Estate that bears financial responsibility for removal of the tanks and any other response costs. *See* Presiding Officer's Proposed Report and Recommendation at 8, n. 3 (adopted by the Board). In any event, the Fund, apparently in recognition that the real issue in this case is whether the required tank fee was paid, does not challenge the Estate's standing to prosecute this appeal in Pickens' name. Nor does the Fund devote substantial argument on the ownership and registration issues. To do so, as the Presiding Officer noted, would elevate form over substance.

$300 to $364.64.[8] In January of 1995, the Board sent its invoice for the 1995 fee of $300. When it was not paid, the Board continued to invoice for the 1995 fee, in December of 1995 and again in December of 1996. However, no penalty was added to the 1995 annual tank fee. More importantly, the 1995 invoices did not include the amount unpaid for the 1994 coverage period. In 1996, the tank fee was reduced to $0 for the 1996 coverage period. No fees on Pickens' storage tanks were assessed after the 1995 coverage period.

The majority concludes that "current fee" means every fee ever assessed to Pickens. The Board's own conduct, however, was not consistent with this understanding of "current fee." If it were, the invoice for the "current fee" for 1995 would have also included the unpaid amount for 1994. When, in 1996, the tank fee was reduced to $0, the Board stopped invoicing altogether. However, if the majority is correct, then the "current fee" for 1996 was the combination of the unpaid fees for 1994 and 1995. Similarly, the "current fee" for 1997 was the unpaid 1994 and 1995 fees plus $0 for the 1997 tank fee. However, the Board did not generate an invoice for a "current fee" in these amounts, or any amount, after 1996.

In fact, the Board's invoicing practices conform to an understanding of "current" to mean the fee assessed for the current annual coverage period. This is the way an insurance premium works. Coverage lapses when a premium is not paid; it is reinstated when the premium is paid.[9] However, there is no coverage for losses that occur during the period of time coverage has lapsed. If a fire destroys a home before the policy is reinstated, the homeowner cannot look to the insurer to cover the loss. Here, Pickens could not have looked to the Fund, if it were shown, for example, that a spill, or loss, occurred in 1995.

The majority asserts that the Fund's fee system bears no relation to insurance coverage, stating that this Court "rejected the notion that the Fund was like an insurance policy" in *M.H. Davis Estate Oil Co., Inc. v. Underground Storage Tank Indemnification Board*, 789 A.2d 398 (Pa.Cmwlth. 2001). I disagree with this description of *M.H. Davis*. In that case, we affirmed the Board's denial of eligibility because the tank owner tried to pay the current fee only after the loss occurred. In *M.H. Davis*,[10] the Board adopted the Presiding Officer's proposed report that stated,

8. The penalties assessed were fixed at $64.64 for the $300 tank fee that was not paid in 1994. The first invoice of $300 ($100 for each of three tanks) had a payment due date of December 15, 1993, for the 1994 fees. The second invoice, sent in August of 1994, was $315, which included a $15 penalty. In September of 1994, the invoice amount was $330.75. The amount was increased to $347.28 by October and to $364.64 by November 10, 1994.

   On November 23, 1994, the Fund sent an invoice of $300 for the 1995 tank fees. Again, in January, the 1995 tank fees were billed at $300, but in February of 1995, the tank fees were billed at $200. There is no explanation in the record for this inconsistency. Penalties were not assessed on the 1995 fees. The foregoing invoice amounts and dates are listed in the Presiding Officer's Proposed Report and Recommendation, Finding of Fact No. 8, which was adopted by the Board.

9. The regulations promulgated under the Tank Act also confirm that Fund coverage is analogous to private insurance coverage. For example, 25 Pa.Code § 977.33 establishes "coverage limits" up to any "annual aggregate amount per occurrence." Exclusions, *i.e.*, where Fund coverage does not apply, are standard insurance exclusions, including an "intentional act of participant." 25 Pa.Code § 977.33(b)(1).

10. The issue in *M.H. Davis* was whether a claimant was eligible for payment from the

while [the Fund is] not a private insurer, it is analogous to an insurer in that participants pay the fee to share a risk. Paying after a loss is known defeats the purpose of sharing unforeseen losses.

*In Re: M.H. Davis Estate Oil Co., Inc. and West Chester Land Corp.*, Presiding Officer's Proposed Report and Recommendations at 11 (*M.H. Davis*, Proposed Report and Recommendations).

The majority also overlooks the Board's interpretation of the word "current fee" that was rendered in the *M.H. Davis* adjudication. The Board held that "past due fee" was found to be quite different from "current fee." The Presiding Officer reasoned as follows:

[U]nder the claimants' interpretation, the word "current" would be surplussage [sic] at best and inappropriate at worst. The claimants assert that to be eligible a claimant must pay fees accrued in the past through the time of claim submission. *Rather than paying a current fee, such a claimant pays "all fees," "outstanding fees," "past due fees," "accrued fees" or the like.* These terms are vastly different from the term "current fee." In fact, the meaning propounded by the claimant is unchanged if "current fee" is replaced with simply "fees." Every statute shall be construed, if possible to give effect to all its provisions. 1 Pa.C.S. § 1921. The claimants' interpretation renders a word in the statute unnecessary and inaccurate.

*M.H. Davis*, Proposed Report and Recommendations at 12–13 (footnote omitted) (emphasis added). The Presiding Officer went on to observe that "the Tank Act defines eligibility as contingent on payment of the current fee." *Id.* at 16. Specifically, he explained that

[c]overage lapses when the tank owner fails to pay the current fee ... the tank owner becomes ineligible as soon as the current fee becomes delinquent and becomes eligible as soon as the current fee is paid. In other words, payment of the current assessment results in current coverage.

*Id.* at 13. The proposed report was adopted *in toto* by the Board, becoming its final adjudication.

In sum, the clear and unequivocal position of the Board in *M.H. Davis* was that "current fee" means the fee assessed for the "annual coverage period." In this case, the "current fee" assessed for the annual coverage periods since 1996 has been $0. If there is no current fee to be paid, eligibility for coverage on the loss caused by the failure of the tanks on the Estate's property cannot be questioned.

The Fund was established to protect the general welfare of the citizens of Pennsylvania. *M.H. Davis Estate Oil Co., Inc.*, 789 A.2d at 403. To advance this remedial purpose, a wide range of persons are entitled to participate in the Fund. "Participant" has been defined in the Board's regulations to be:

Fund if the current fee was paid after the release was discovered. This Court affirmed the Board's finding "that Section 706(2) was intended to assure that tank owners and operators have paid for coverage before a loss is incurred." *In Re: M.H. Davis Estate Oil Co., Inc. and West Chester Land Corp.*, Board Adjudication and Order at 16. We note that Petitioners have filed, along with their brief and reproduced record on appeal, a supplemental record of "Materials from *M.H. Davis v. Un-*

*derground Storage Tank Indemnification Board of the Commonwealth of Pennsylvania*, [789 A.2d 398]Docket No. 1000 C.D.2001." Although the majority does not specifically address the propriety of including these materials, inclusion of the underlying administrative decision in *M.H. Davis* seems proper under Pa. R.A.P. 2133 (providing for reproduction of copies of unpublished administrative decisions referred to in published opinions).

(i) An owner or operator of a UST [underground storage tank].

(ii) An owner or operator of a HOT [heating oil tank].

(iii) A certified company.[11]

25 Pa.Code § 977.4. It is noteworthy that this definition of "participant" makes no mention of fee payment. This supports the conclusion that the Board understood that in some years, for some participants, there might be no fee assessed for the current coverage period. That is the situation here. The Fund has determined, since at least 1996, that participants with dormant tanks need not be assessed. The collection of gallon, non-retail bulk and capacity fees from business entities that are actively engaged in the ongoing storage and distribution of regulated substances, such as gasoline and heating oil, has continued. *See* 25 Pa.Code § 977.12.[12] These fees, not fees on unused tanks, generate the revenue needed to cover the claims of all participants, according to the Fund's actuary. Section 705(d) of the Tank Act, 35 P.S. § 6021.705(d).

Neither the Tank Act nor its implementing regulations provide for collection of delinquent past due tank fees in a subsequent coverage period. Neither allow the Board to revoke current eligibility for fees unpaid from prior coverage periods. Expanding the term "current fee" to include all amounts ever assessed defeats the remedial purpose of the Tank Act to provide for the clean up of spilled petroleum that may endanger the health of all Commonwealth citizens. The legislature chose the term "current," and it is not for the Board, or this Court, to limit eligibility for payment of claims by the Fund beyond those established by the General Assembly.

For the foregoing reasons, I would reverse the order of the Board.

---

**11.** A "certified company" is "[a]n entity, including, but not limited to, a sole proprietorship, a partnership or a corporation, which is authorized by the DEP to conduct tank-handling activities, tightness testing activities or inspection activities using certified installers, certified inspectors or both." 25 Pa.Code § 977.4 (citation omitted).

**12.** Section 977.12 provides:
Owner and operator fees.
(a) *Annual fees.* The Board may charge fees established in this section, based on an annual actuarial review.
(b) *Tank and gallon fees.* A UST owner or operator storing gasoline, new motor oil, hazardous substances, gasohol, aviation fuel, mixture, farm diesel and other types of substances based on the tank registration information maintained by the DEP may be assessed the following fees:
(1) *Tank fee.* A tank fee of $0 per UST per year.
(2) *Gallon fee.* A gallon fee on all regulated substances entering a UST of $.011

per gallon. (For example, 10,000 gallons at $.011 per gallon equals $110).
(c) *Nonretail bulk storage.* Total fees paid by an owner or operator of a nonretail bulk storage or wholesale distribution UST storing gasoline are established using the method described in subsection (b) and are capped at $5,000 per UST per year in accordance with section 705(d)(3) of the act (35 P.S. § 6021.705(d)(3)).
(d) *Capacity fee.* An owner or operator which stores regulated substances including diesel, heating oil, used motor oil, kerosene and unknown substances based on the tank registration information maintained by the DEP may be assessed a capacity fee of $.0825 per gallon of capacity, which amount is established in accordance with section 705(d)(2) of the act (35 P.S. § 6021.705(d)(2)). (For example, 10,000 gallons at $.0825 per gallon equals $825).
25 Pa.Code § 977.12.