**TRANSPORTATION SERVICES, INC., Petitioner**

v.

**UNDERGROUND STORAGE TANK INDEMNIFICATION BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 16, 2012.

Decided April 24, 2013.

---

Matthew L. Wolford, Erie, for petitioner.

Amy L. Weber, Insurance Department Counsel, Harrisburg, for respondent.

BEFORE: LEAVITT, Judge, and BROBSON, Judge (P.), and FRIEDMAN, Senior Judge.

OPINION BY Judge LEAVITT.

Transportation Services, Inc. petitions for review of the adjudication of the Board of the Pennsylvania Underground Storage Tank Indemnification Fund denying its claim for reimbursement of expenses incurred in cleaning up contamination caused by a leak from one of its underground storage tanks. The Board denied the claim for the stated reason that Transportation Services was not current on its storage tank capacity fees when the contamination was discovered. Transportation Services argues that because it pumped out and closed its tanks in the fall of 1997, it was not required to pay any fees to the Fund after January 1, 1998. Further, the parties agree that Transportation Services had timely paid all capacity fees assessed by the Fund through the middle of 1998, well past the date the tanks were emptied. Accordingly, Transportation Services argues that it was current on its fees when, in 2005, the contamination was discovered. We agree and reverse and remand.

The background to this appeal was established by stipulation of the parties. Transportation Services is a corporation that did a commercial trucking business in several states from a facility located at 3025 West 17th Street in Erie, Pennsylva-

nia.[1] The West 17th Street property was owned by Joseph Benacci and his wife, Berit Benacci, when, in 1977, they installed four large underground storage tanks on the property. Two of the storage tanks, each with a capacity of 10,000 gallons, were used to store diesel fuel. The third tank had a capacity of 10,000 gallons and stored gasoline. The fourth tank had a capacity of 8,000 gallons and stored new motor oil. Reproduced Record at 25a (R.R. ——).

From 1982 to 1992, the Benaccis rented the West 17th Street property to Ryder Truck Rental, which used the four storage tanks in its business. In 1987, a leak of diesel fuel was discovered, and Ryder did the remediation. In May of 1995, the Pennsylvania Department of Environmental Protection (Department) issued a "no further action" letter, confirming that the remediation had been successfully completed. R.R. 2a. After Ryder closed its business in 1992, Transportation Services began using the West 17th Street property for its own trucking operations, which shut down in 1997.

On July 25, 1997, the Benaccis conveyed the West 17th Street property to Transportation Investment Group, a partnership of the Benaccis' five children (Partnership). Joseph Benacci and his son, Raymond, serve as general managers for the Partnership. The Partnership decided to develop the West 17th Street property by constructing a new building for Federal Express. This construction necessitated pumping out the four storage tanks and removing the fuel island and pumping equipment. These steps rendered the four underground storage tanks empty and inoperable by the fall of 1997.

Because of their proximity to the FedEx building, the storage tanks could not be removed but had to be closed permanently *in situ.* The Partnership contracted with United Environmental to do a permanent closure by filling them with concrete, but the closure was delayed by construction at the site and by United Environmental's other commitments in 1998. Federal regulation required all underground storage tank owners to upgrade their tanks, remove them or permanently close them no later than December 22, 1998. 40 C.F.R. § 280.21.[2] On December 22, 1998, United Environmental completed the permanent closure of the storage tanks on the West 17th Street property, and on December 23, 1998, the Partnership notified the Department that the tanks had been permanently closed in accordance with 40 C.F.R. § 280.21.

When the tanks were emptied in the fall of 1997, approximately one inch of a fuel and water residue remained in each tank. United Environmental removed this residue as part of the December 1998 permanent closure. The total residue from all four tanks, which had a total storage capacity of 38,000 gallons, was able to be contained in a single 55–gallon drum.

In January of 2002, the Department directed the Partnership to install three monitoring wells and to do groundwater sampling at the West 17th Street property.

1. "Transportation Services, Inc." is a registered fictitious name for T.S. Inc., a North Carolina corporation that is owned by Joseph and Berit Benacci.

2. The federal regulation states, in relevant part, that "[n]ot later than December 22, 1998, all existing systems must comply with one of the following requirements: (1) New [underground storage tank] system performance standards under § 280.20; (2) The upgrading requirements in paragraphs (b) through (d) of this section; or (3) Closure requirements under Subpart G of this part, including applicable requirements for corrective action under Subpart F." 40 C.F.R. § 280.21(a).

A sample done in March of 2002 satisfied the applicable environmental standards, but a sample done in June of 2002 did not; it showed a measurable amount of "phase liquid." Benacci believed that this phase liquid related to the 1987 release and, thus, its remediation was the responsibility of Ryder. However, Benacci did not succeed in convincing the Department to pursue Ryder, and the responsibility fell on Transportation Services.

The Fund's billing records listed Joseph Benacci as the owner of the tanks and Transportation Services as the facility using the tanks. The Fund began charging Transportation Services fees on the West 17th Street storage tanks in 1994 and continued to do so through 1999. The Storage Tank and Spill Prevention Act (Storage Tank Act)[3] imposes different types of fees on underground storage tanks, such as "tank fees," "gallon fees" and "capacity fees." A "capacity fee" is one calculated on the size, or capacity, of a tank whereas a "gallon fee" is one calculated on the number of gallons that pass through a tank. The only fee at issue in this appeal is the capacity fee owing by Transportation Services under the Storage Tank Act.

Transportation Services paid all invoiced fees through the first half of 1998. However, when Benacci received the second 1998 invoice for capacity fees, he returned it with a note stating that the tanks were not in service and no fee was owed. He wrote "please advise" on the invoice but received no response. He spoke with a Fund representative on August 18, 1998, and January 26, 1999, but the issue of the capacity fee remained unresolved. The Fund did withdraw its demand for payment of the 1999 fees, but it sent a letter to Benacci stating that the 1998 fee was owed and notifying him of his right of appeal; Benacci denies ever receiving the letter.

The Fund then referred Transportation Services' unpaid 1998 capacity fee to the Office of Attorney General for collection. The Attorney General notified Transportation Services on November 16, 2005, and on December 1, 2005, that legal action would be taken if the outstanding capacity fee were not paid. On December 6, 2005, the Partnership paid the disputed fee of $1,000 for the second half of 1998.

On August 29, 2002, Transportation Services filed a claim for its remediation costs with the Fund. On November 30, 2005, ICF Consulting, the Fund's third-party administrator, denied Transportation Services' claim for the stated reason that it had not been current on its fees when the contamination was discovered. Transportation Services sought a review of the claims manager's decision from the Insurance Department's Bureau of Special Funds. On February 7, 2006, the Bureau notified Benacci that because "capacity fees for the last half of 1998 were never paid by your company," it was upholding the decision of the claims manager "under [authority of] 25 Pa.Code § 977.31(2)." R.R. 102a, 103a. The Bureau advised Benacci of his right to further review from the Administrative Hearings Division of the Insurance Department, which Transportation Services pursued. The parties agreed to a stipulation of facts, and then briefed the legal question of whether Transportation Services owed a capacity fee to the Fund after 1997.

On May 31, 2011, four years after the last brief was filed, the presiding officer issued a proposed report and a recommendation that the claim be denied. The Storage Tank Act requires all storage tank fees to be paid *before* a need for remedia-

---

**3.** Act of July 6, 1989, P.L. 169, *as amended*, 35 P.S. §§ 6021.101–6021.2104.

tion is discovered, and the presiding officer held that Transportation Services had not satisfied this requirement when, in July of 2002, contamination was discovered. The presiding officer rejected Transportation Services' argument that no fee was owing for the second half of 1998 after the tanks had been emptied and rendered inoperable in 1997. In reaching this conclusion, the hearing officer cited the Fund's regulation at 25 Pa.Code § 977.12(d),[4] which requires the payment of capacity fees by owners or operators of tanks that store "regulated substances." The tanks contained a small amount of residual fuel and water mixture in 1997, which the presiding officer found to be a "regulated substance" under Section 103 of the Storage Tank Act.[5] She also agreed with the Fund that capacity fees must be paid until a permanent closure report is filed with the Department of Environmental Protection, and this event did not occur until December of 1998. The presiding officer recommended denying Transportation Services' claim for remediation costs.

Transportation Services filed exceptions to the hearing officer's proposed report, and the Board rejected them. It rejected Transportation Services' challenge to the Fund's rule that a fee must be paid until a closure report is filed with the Department, even if the tank is empty. The Board explained that until a tank is permanently closed it may be susceptible to leaks, and it agreed with the presiding officer that the residual fuel and water mixture found in the tanks constituted a "regulated substance" that subjected Transportation Services to the $1,000 capacity fee for the second half of 1998. Because this 1998 fee had not been paid prior to the 2002 discovery of a release, Transportation Services was held ineligible for its claim for reimbursement from the Fund. Transportation Services then petitioned for this Court's review.[6]

Transportation Services presents three issues for our review. First, it argues that the Board erred in relying upon Section 977.12(d) of Title 25 of the Pennsylvania

---

4. The text of this regulation appears in this opinion, *infra*.

5. A "regulated substance" is:

An element, compound, mixture, solution or substance that, when released into the environment, may present substantial danger to the public health, welfare or the environment which is:
(1) any substance defined as a hazardous substance in section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Public Law 96–510, 94 Stat. 2767), but not including any substance regulated as a hazardous waste under Subtitle C of the Resource Conservation and Recovery Act of 1976 (Public Law 94–580, 42 U.S.C. § 6901 et seq.);
(2) petroleum, including crude oil or any fraction thereof and hydrocarbons which are liquid at standard conditions of temperature and pressure (60 degrees Fahrenheit and 14.7 pounds per square inch

absolute), including, but not limited to, oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other nonhazardous wastes and crude oils, gasoline and kerosene; or
(3) any other substance determined by the department by regulation whose containment, storage, use or dispensing may present a hazard to the public health and safety or the environment, but not including gaseous substances used exclusively for the administration of medical care. The term does not include the storage or use of animal waste in normal agricultural practices.
35 P.S. § 6021.103.

6. Our scope of review is to determine whether the government agency violated constitutional rights, erred as a matter of law and whether its findings of fact are supported by substantial evidence. *Pickens (Estate of Sherman) v. Underground Storage Tank Indemnification Board,* 890 A.2d 1117, 1119 n. 8 (Pa.Cmwlth. 2006).

Code because this regulation was promulgated in 2002 and had no application to the calculation of capacity fees owed by Transportation Services in the second half of 1998. Second, it argues that the regulation that was in effect in 1998, *i.e.*, 25 Pa.Code § 971.2(3), did not impose a capacity fee on empty tanks containing a small amount of residue but only on tanks storing home heating oil product and diesel fuel product. The "residual mixture" in the tanks at issue here was neither type of product. Further, it is clear that the Fund's regulation, read as a whole, imposes a capacity fee only on tanks actually in use and not those that are empty. Third, the Board's "permanent closure" rule is void as a *de facto* regulation adopted in violation of the act commonly known as the Commonwealth Documents Law[7] and, thus, invalid.

We begin with a review of the relevant provisions of the Storage Tank Act. Section 706 establishes the eligibility requirements for a claimant seeking to recover its remediation costs from the Fund. A claimant must meet the following requirements:

(1) The claimant is the owner, operator or certified tank installer of the tank which is the subject of the claim;

(2) *The current fee required under section 705 has been paid;*

(3) The tank has been registered in accordance with the requirements of section 503;

(4) The owner, operator or certified tank installer has obtained the appropriate permit or certification under sections 108, 501 and 504;

(5) The claimant demonstrates to the satisfaction of the Board that the release that is the subject of the claim occurred after the date established by the Board for payment of the fee required by section 705(d);

(6) Additional eligibility requirements which the Board may adopt by regulation.

35 P.S. § 6021.706 (emphasis added). Section 705(b) obligates the Board to establish the procedures by which "owners, operators and certified tank installers may make claims" for costs incurred in responding to a "sudden or nonsudden release from underground storage tanks." 35 P.S. § 6021.705(b).[8] Section 705(d) obligates the Board to establish the amount of fee necessary to "pay outstanding and anticipated claims against . . . the Fund" by the "owner, operator or certified tank installer . . . of underground storage tanks." 35 P.S. § 6021.705(d)(1).[9] Significantly, the

---

7. Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §§ 1102–1602, 45 Pa.C.S. §§ 501–907.

8. Section 705(b) of the Storage Tank Act states:

Claims.—*The board shall establish procedures by which owners, operators and certified tank installers may make claims for costs* estimated or incurred in taking corrective action and for liability due to bodily injury and property damage caused by a sudden or nonsudden release from underground storage tanks. Claims determined to be eligible shall be paid upon receipt of information clearly showing that reimbursable claim costs are reasonable, necessary

and directly related to the release from the storage tank that is the subject of the claim. The board, by regulation, may establish a system for prioritizing claims.

35 P.S. § 6021.705(b) (emphasis added).

9. Section 705(d) of the Storage Tank Act states:

Fees—

(1) *The board, by regulation, shall establish fees to be paid by the owner, operator or certified tank installer, as appropriate, of underground storage tanks.* Fees shall be set on an actuarial basis in order to provide an amount sufficient *to pay outstanding and anticipated claims against the Underground Storage Tank Indemnification*

Storage Tank Act directs the Board to establish the Fund's fees "by regulation." *Id.*

■ In its first issue, Transportation Services argues that it had paid the "current fee required under section 705" when it submitted its remediation claim. 35 P.S. § 6021.706(2). In holding otherwise, the Board relied, erroneously, upon Section 977.12(d) of Title 25 of the Pennsylvania Code, which was adopted four years after the Fund assessed Transportation Services for the 1998 fee. The Fund responds that Transportation Services waived this issue because it did not point out to the Board that the presiding officer had applied the wrong regulation.

From the beginning, the Fund's claims manager and the Bureau of Special Funds directed Transportation Services to the regulation at 25 Pa.Code § 977.12(d). This regulation states as follows:

> (d) *Capacity fee. An owner or operator which stores regulated substances* including diesel, heating oil, used

> *Fund* in a timely manner. Fees shall also include an amount sufficient to meet all other financial requirements of the board. Fees shall be adjusted as deemed necessary by the board, but no more than once a year. The board shall annually evaluate the fee amount to determine if it is sufficient to meet the anticipated expenses of the fund and provide a copy of its evaluation to the Environmental Resources and Energy Committee of the Senate and the Conservation Committee of the House of Representatives. The board shall analyze the claims experience of storage tanks to determine which types of underground tanks or tank configurations result in less frequent leaks.
>
> (2) The owner or operator of an underground storage tank used to store heating oil, diesel fuel or other regulated substance as determined by the board shall pay a per gallon of tank capacity fee. The capacity fee shall be set on the same actuarial basis as is provided in subsection (d)(1).

motor oil, kerosene and unknown substances based on the tank registration information maintained by the DEP may be assessed a capacity fee of $.0825 per gallon of capacity, which amount is established in accordance with section 705(d)(2) of the act (35 P.S. § 6021.705(d)(2)). (For example, 10,000 gallons at $.0825 per gallon equals $825).

25 Pa.Code § 977.12(d) (emphasis added). This regulation was adopted in 2002 and replaced an earlier regulation on capacity fees promulgated in 1993, which stated as follows:

> (3) [Underground storage tanks] *which store regulated substances limited to heating oil products and diesel fuel products.* A per gallon of capacity fee on regulated [underground storage tanks] storing heating oil or diesel fuel products set at 150 per gallon of capacity, which amount is calculated in accordance with section 705(d)(2) of the act.[10]

> (3) In no case shall the owner or operator of an underground storage tank used for nonretail bulk storage or wholesale distribution of gasoline pay fees totaling more than $5,000 per tank in any annual coverage period for which fees are charged.
>
> (4) The owner or operator of an underground tank used to store diesel fuel on a farm for noncommercial purposes shall be required to pay the same fee as the owner or operator of an underground tank containing gasoline.

35 P.S. § 6021.705(d) (emphasis added).

10. It states as follows:

> (2) The owner or operator of an underground storage tank used to store heating oil, diesel fuel or other regulated substance as determined by the board shall pay a per gallon of tank capacity fee.

35 P.S. § 6021.705(d)(2). This regulation also sets forth the rules for calculating tank fees; non-rental bulk storage fees; and gallon fees. These other fees are not relevant in this regulation. The 2002 version of the fee regu-

25 Pa.Code § 971.2(3) (emphasis added). It is beyond peradventure that the version of the fee regulation relied upon by the Board in its analysis, *i.e.*, 25 Pa.Code § 977.12(d), was not in effect in 1998.

The difference between the 1993 and 2002 versions of the "capacity fee" regulation is significant. The 2002 version is broader in scope than the 1993 version because it covers the storage of "regulated substances," including unknown substances. By contrast, the 1993 regulation imposes a capacity fee on tanks that "store regulated substances *limited* to heating oil products and diesel fuel products." 25 Pa.Code § 971.2(3) (emphasis added). Stated otherwise, it did not impose a capacity fee on every regulated substance, but only on heating oil and diesel fuel *products*. The fuel and water residue that remained in Transportation Services' tanks throughout most of 1998 was not a heating oil product or a diesel fuel product. The residue was not even a "product" with commercial value but, rather, a type of residual waste.

The Fund responds that Transportation Services has waived this issue because it did not point out at the administrative hearing that 25 Pa.Code § 977.12(d) was not in effect in 1998. The Fund argues that the Pennsylvania Rules of Appellate Procedure and the Administrative Agency Law do not allow this Court to review an issue not preserved for appeal. Transportation Services responds that the Fund gives too narrow a read of "issue" and erroneously conflates it with "legal argument." It contends that both parties labored under a mutual mistake about the

applicability of 25 Pa.Code § 977.12(d). It was the Board's obligation to invoke and apply the correct regulation when it turned down Transportation Services' claim, and it erred. The Board cannot reap the benefit of its own error by invoking the doctrine of waiver.

■ The Board stated in its adjudication that the controlling issue was "whether all fees were current at the time the release giving rise to the claim was discovered." Board Adjudication at 4. The parties stipulated that the issue in this case is whether the "current fee required under Section 705 of the [Act], 35 P.S. § 6021.705, had not been paid, which arises under eligibility requirement 25 Pa. Code § 977.31(2)."[11] R.R. 11a. In reaching the conclusion that Transportation Services was in arrears on its "current fee," the Board applied a regulation not in existence when the Fund invoiced Transportation Services in 1998. An administrative agency's application of a law not in effect at the time of a claim is reversible error. *See Whitehead v. Casey Building Wreckers, Inc.*, 6 Pa.Cmwlth. 256, 294 A.2d 215 (1972) (holding that agency erred in applying 1939 version of the Workmen's Compensation Act instead of the language of the 1956 version).

We reject the Fund's contention that this Court cannot address the Board's error in applying the wrong regulation in its adjudication. The Pennsylvania Rules of Appellate Procedure direct that "[n]o *question* shall be heard or considered by the court which was not raised before the government unit." Pa. R.A.P. 1551(a) (emphasis added).[12] Similarly, Section 703 of

---

lation also provides for these other types of fees.

11. Section 977.31(2) states that for a participant to be eligible for Fund coverage the "current fee under Section 705 of the act (35 P.S. § 602.705) has been paid." 25 Pa.Code

§ 977.31(2). In other words, 25 Pa.Code § 977.31(2) simply restates the regulation.

12. It states:

(a) Appellate jurisdiction petitions for review. Review of quasijudicial orders

the Administrative Agency Law states that a "party may not raise upon appeal any other *question* not raised before the agency ... [except on] due cause shown." 2 Pa.C.S. § 703(a).[13] The "question" before this Court is whether Transportation Services owed a capacity fee for the second half of 1998 after its tanks were emptied of heating oil product and diesel fuel product. A "question" is not synonymous with a legal argument. If this were true, then appellate courts would not have the ability to affirm a lower court's order on other grounds. *See, e.g., Wilson v. Plumstead Township Zoning Hearing Board*, 594 Pa. 416, 936 A.2d 1061 (2007) (affirming on different grounds Commonwealth Court's denial of variance; Supreme Court held landowner failed to demonstrate unnecessary hardship and rejected this Court's finding of self-inflicted hardship). Indeed, until the Board presented its legal analysis in its adjudication, Transportation Services

could not know what error it might contain. In any case, the mutual mistake of the parties constitutes "due cause shown" under the Administrative Agency Law for reviewing the Board's citation of the wrong regulation. 2 Pa.C.S. § 703(a).

 The waiver cases cited by the Board are distinguishable. In *Dilliplaine v. Lehigh Valley Trust Company*, 457 Pa. 255, 322 A.2d 114 (1974), it was held that by not lodging a timely objection to the trial court's instruction, the appellant did not preserve the issue for appeal. In *Wing v. Unemployment Compensation Board of Review*, 496 Pa. 113, 436 A.2d 179 (1981), it was held that the employer waived the issue of a claimant's willful misconduct by pursuing only the theory that claimant had resigned. Neither case deals with a situation where the legal "question" remained constant, and neither case deals with a mutual mistake.[14] More

---

shall be conducted by the court on the record made before the government unit. *No question shall be heard or considered by the court which was not raised before the government unit* except:
(1) Questions involving the validity of a statute.
(2) Questions involving the jurisdiction of the government unit over the subject matter of the adjudication.
(3) Questions which the court is satisfied that the petitioner could not by the exercise of due diligence have raised before the government unit. If, upon hearing before the court, the court is satisfied that any such additional question within the scope of this paragraph should be so raised, it shall remand the record to the government unit for further consideration of the additional question. The court may in any case remand the record to the government unit for further proceedings if the court deems them necessary.
Pa. R.A.P. 1551 (emphasis added).

13. Section 703 provides as follows:
(a) General rule.—A party who proceeded before a Commonwealth agency under the terms of a particular statute shall not be

precluded from questioning the validity of the statute in the appeal, *but such party may not raise upon appeal any other question not raised before the agency* (notwithstanding the fact that the agency may not be competent to resolve such question) *unless allowed by the court upon due cause shown.*
(b) Equitable relief.—The remedy at law provided by subsection (a) shall not in any manner impair the right to equitable relief heretofore existing, and such right to equitable relief is hereby continued notwithstanding the provisions of subsection (a).
2 Pa.C.S. § 703 (emphasis added). Again, the "question" was whether the capacity fee was properly assessed.

14. The concept of mutual mistake generally arises in contract cases. When both parties to a contract are mistaken as to existing facts at the time of execution, the party adversely affected by such mistake may be granted relief. *Loyal Christian Benefit Association v. Bender*, 342 Pa.Super. 614, 493 A.2d 760, 762 (1985). The mistake must relate to the basis of the bargain; it must be material; and the mistaken fact must not have been a risk contemplated by the contract and placed on the

importantly, neither case deals with a situation where the state agency has itself been the source of the mistake. A state agency should, and usually can, be relied upon to know its own regulation and when it became effective.

The Board might have confessed error to the Court rather than try to benefit from its error. The Fund wrongly advised Transportation Services that the operative regulation for determining a fee in 1998 was that quoted by the Insurance Department's Bureau of Special Funds in its denial letter. The 1993 regulation in effect when the 1998 capacity fee was assessed upon Transportation Services was 25 Pa. Code § 971.2(3), and it is the one that must be considered in deciding whether the "current fee required under section 705 has been paid." 35 P.S. § 6021.706(2). Even were it so inclined, the Court cannot make the 2002 regulation applicable in 1998 by the doctrine of waiver or any doctrine.[15] The law is the law.

■ In its second issue, Transportation Services argues that neither the 1993 nor the 1998 regulation imposed a capacity fee on the owners or operators of empty, inoperable storage tanks. Each version of the fee regulation imposed a fee only on tanks actually in use. Transportation Services'

tanks were emptied, disabled and permanently removed from service in December of 1997, as acknowledged by the Fund in the stipulation. The Board's finding that the residue in the tanks was a regulated substance was irrelevant because the appropriate regulation at 25 Pa.Code § 971.2(3) did not impose a capacity fee on tanks containing a small amount of residue. Accordingly, Transportation Services was current on its fee and is eligible to claim remediation costs.

The Board responds that after tanks are removed from service, they present a threat to the environment even if they contain no more than one inch of oil and water residue. Thus, fees must be paid until the owner of the tank files a permanent closure report with the Department. For its part, Transportation Services argues that the stipulation of fact did not provide that one inch of residue poses any threat to the environment.

Section 451(c) of Title 25 of the Pennsylvania Code differentiates between tanks being used for storage and tanks that are "empty."[16] Section 451(a) stated that a storage tank is

> *empty* when all materials have been removed using commonly employed practices so that no more than 2.5 centime-

injured party. *Id.* If this test is met, the injured party may obtain reformation of the contract.

15. The concept is as anathema as would be allowing parties, by their agreement, to vest a court with subject matter jurisdiction. *See, e.g., Zuver v. Workers' Compensation Appeal Board (Browning Ferris Industries of PA, Inc.),* 755 A.2d 112, 114 (Pa.Cmwlth.2000) ("[T]he parties cannot confer subject matter jurisdiction on a tribunal by agreement or stipulation.").

16. The current version of Section 451 of Title 25 contains the same language, but it is now found at 25 Pa.Code § 245.451(c). The current version of the regulation requires an

owner or operator to amend its registration with the Department within 30 days of a temporary closure. 25 Pa.Code § 245.451(a). The previous version of Title 25 of the Pennsylvania Code similarly required an owner or operator to amend the registration for temporary closure, albeit in a different section: 25 Pa.Code § 245.423(f) ("Every owner, including a new owner of an existing tank system, shall complete an amended registration form, provided by the Department, when one or more of the following conditions occur: ... (4) Change in tank system service such as, but not limited to, temporary closure or change to an unregulated substance."). *See* 27 Pa. Bull. 5369 (1997).

ters (1 inch) of residue ... remain in the system.

25 Pa.Code § 245.451(a) (amended and re-promulgated at 25 Pa.Code § 245.451(c)) (emphasis added). Likewise, the applicable federal regulation defines "empty" in the same manner.

The [underground storage tank] system is *empty* when all materials have been removed using commonly employed practices so that no more than 2.5 centimeters (one inch) of residue ... remain in the system.

40 C.F.R. § 280.70(a). Finally, both state and federal regulations provide that release detection is not required for empty tanks. *See* 25 Pa.Code § 245.451(a) ("Release detection is not required as long as the underground storage tank system is empty."); 40 C.F.R. § 280.70(a) ("[R]elease detection is not required so long as the [underground storage tank] system is empty.").

The regulation distinguishes "empty" tanks from those "storing" a regulated substance that, by applicable law, are considered to pose a risk of release. It follows that capacity fees are not due on tanks that are empty and closed. The regulation provides that a tank is empty even if it contains one inch of "residue." 25 Pa.Code § 245.451(a). Neither the 1993 nor the 2002 version of the fee regulation expressed an intent to impose a capacity fee on tanks that meet the legal definition of "empty." We hold, therefore, that the Fund lacked authority to charge Transportation Services a capacity fee after 1997 once it was established, factually, that its tanks were empty as that term is defined in 25 Pa.Code § 245.451(a).

In its third issue, Transportation Services argues that the Fund's "permanent closure" rule is not authorized by the Storage Tank Act and constitutes a *de facto* regulation adopted in violation of the Commonwealth Documents Law.[17] Neither the 1993 nor the 2002 version of the Fund's fee regulation makes any reference to the filing of a closure report with the Department of Environmental Protection; each regulation was binding on the Fund at all relevant times. Transportation Services also challenges the Fund's proffered rationale for the permanent closure rule, *i.e.*, that it would be "logistically difficult, resource intensive, and highly impractical" for the Fund to investigate a claimant's tanks as part of determining eligibility. Board's Adjudication at 7.

The Board responds that the permanent closure rule is a valid interpretative rule that closely tracks the language and intent of the fee regulation and the Storage Tank Act. It is reasonable to tie fees to closure reports filed with the Department, and this rationale also applies to every version of the fee regulation. Further, the Fund argues that interpretative rules do not need to be promulgated in accordance with the Commonwealth Documents Law so long as they track the meaning of the underlying statute.

A regulation has the force and effect of law. *City of Pittsburgh, Department of Personnel and Civil Service Commission v. Pennsylvania Human Relations Commission*, 157 Pa.Cmwlth. 564, 630 A.2d 919, 921 n. 4 (1993). The same is not true of a statement of policy, which expresses, at most, an agency's interpretation of law, as that law is expressed in a statute or a regulation. It is the agency's burden to demonstrate that its interpreta-

---

17. Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102–1602, 45 Pa.C.S. §§ 501–907.

tion of the statute or regulation is correct, whether or not a statement of policy has been published. *Borough of Bedford v. Department of Environmental Protection*, 972 A.2d 53, 61 (Pa.Cmwlth.2009). A statement of policy need not be promulgated in accordance with the Commonwealth Documents Law. *Eastwood Nursing and Rehabilitation Center v. Department of Public Welfare*, 910 A.2d 134, 141–42 (Pa. Cmwlth.2006).[18]

■ The effect of an agency's failure to promulgate a regulation in accordance with the Commonwealth Documents Law is to have the regulation declared a nullity. *Germantown Cab Company v. Philadelphia Parking Authority*, 993 A.2d 933, 937 (Pa.Cmwlth.2010), *affirmed*, 614 Pa. 133, 36 A.3d 105 (2012). If an interpretative rule or statement of policy functions as a regulation, then it will be nullified due to the agency's failure to obey the processes applicable to the promulgation of a regulation. *Department of Environmental Resources v. Rushton Mining Company*, 139 Pa.Cmwlth. 648, 591 A.2d 1168, 1171 (1991).[19]

■ Our Supreme Court has explained that a regulation has the effect of a "binding norm" and a statement of policy does not. In *Pennsylvania Human Relations Commission v. Norristown Area School District*, the Court explained:

> *A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications.* A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.
>
> The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings. . . . *A properly adopted substantive rule establishes a standard of conduct which has the force of law* . . . .

---

18. More fully, the requirements for an agency promulgating a regulation include, *inter alia*, (1) providing notice to the public of its intent to promulgate, amend or repeal an administrative regulation; (2) accepting, reviewing and considering written comments regarding the *proposed regulation;* (3) obtaining legal approval of the proposed regulation; and (4) depositing the text of the regulation with the Legislative Reference Bureau for publication in the *Pennsylvania Bulletin.* Sections 201, 202, 205 and 207 of the Commonwealth Documents Law, 45 P.S. §§ 1201, 1202, 1205, and 1207.

19. Notably, a regulation can be legislative or interpretative in nature.
> The former type of rule "is the product of an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the Legislative body," and "is valid and is as binding upon a court as a statute if it is (a) within the granted

power, (b) issued pursuant to proper procedure, and (c) reasonable."
*Girard School District v. Pittenger*, 481 Pa. 91, 94–95, 392 A.2d 261, 262 (1978) (quoting Davis, 1 Administrative Law Treatise § 5.03 at 299 (1958)).
> An interpretative rule on the other hand depends for its validity not upon a Lawmaking grant of power, but rather upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute it interprets. While courts traditionally accord the interpretation of the agency charged with administration of the act some deference, the meaning of a statute is essentially a question of law for the court, and, when convinced that the interpretative regulation adopted by an administrative agency is unwise or violative of legislative intent, courts disregard the regulation.
*Id.* at 95, 392 A.2d at 263 (citations omitted).

A general statement of policy, on the other hand, does not establish a 'binding norm'.... *A policy statement announces the agency's tentative intentions for the future.* When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

473 Pa. 334, 349–50, 374 A.2d 671, 679 (1977) (quoting *Pacific Gas & Electric Co. v. Federal Power Commission*, 506 F.2d 33, 38 (D.C.Cir.1974)) (emphasis added). In applying these principles, this Court has explained that a

"[b]inding norm" means that the agency is bound by the statement until the agency repeals it, and if the statement is binding on the agency, it is a regulation.

*Home Builders Association of Chester and Delaware Counties v. Department of Environmental Protection*, 828 A.2d 446, 451 (Pa.Cmwlth.2003) (quoting *Rushton Mining Company*, 591 A.2d at 1173). A statement of policy, which announces a "tentative" intention for the future, "tracks a statute and does not expand upon its plain meaning." *Groce v. Department of Environmental Protection*, 921 A.2d 567, 578 (Pa.Cmwlth.2007). A pronouncement that leaves the agency with discretion to deviate from its terms can be held to be a statement of policy, not a regulation. *Home Builders Association of Chester*, 828 A.2d at 451.

In sum, a regulation is binding on an agency, and a statement of policy is not. A statement of policy expresses what the agency hopes to implement in future rule-makings or "adjudications," but has no im-mediate effect. *Norristown*, 473 Pa. at 349–50, 374 A.2d at 679. By contrast, a regulation "establishes a standard of conduct which has the force of law." *Id.* at 350, 374 A.2d at 679.

The question here is whether the Fund's permanent closure rule for assessing fees functioned as a regulation that had to be promulgated in accordance with the Commonwealth Documents Law or as a guideline. The Board argues that the permanent closure rule is merely an interpretative rule and, as such, exempt from the Commonwealth Documents Law. We disagree.

First, the Fund's permanent closure rule establishes a standard of conduct which the Fund applies in all situations now and in the future, which is the hallmark of a regulation. *Rushton*, 591 A.2d at 1173. Indeed, the Fund argues that the permanent closure rule is essential to its fee assessment program because without it, tank owners will lie and say their tanks are empty when they are not.[20] In other words, it is a norm binding on the Fund and on tank owners and operators.

Second, neither the Storage Tank Act nor the regulation say anything whatsoever about "permanent closure." It cannot be argued, then, that the permanent closure rule "tracks" the applicable statute and regulation.

Third, Section 705(d)(1) of the Act specifies the procedure by which the Fund will establish its fees, *i.e.*, by regulation. It states, in relevant part, as follows:

The board, *by regulation*, shall establish fees to be paid by the owner, operator or

---

**20.** Transportation Services does not accept this policy argument, noting that availability of Fund coverage is a powerful incentive not to lie. There may be no problem with the Fund's computers generating storage tank fee invoices until a permanent closure report is filed with the Department of Environmental Protection. There is a problem, however, in making the obligation to pay dependent on the filing of a closure report when determining eligibility for Fund coverage.

**156**

certified tank installer, as appropriate, of underground storage tanks....

35 P.S. § 6021.705(d)(1) (emphasis added). This is a clear directive, and it is not limited to the amount of the fee; it applies with equal force to the occasion and duration of the fee obligation. The Fund wants to collect fees from tanks that contain any regulated substance, including residue, until a permanent closure report is filed with the Department of Environmental Protection. This requires a regulation. As a creature of statute, the Fund can exercise only those powers which have been conferred by the legislature in clear and unmistakable language. *Aetna Casualty & Surety Insurance Company v. Insurance Department*, 536 Pa. 105, 118, 638 A.2d 194, 200 (1994). The Fund has not been authorized to establish fees by interpretative rules or policy statements but only by regulation. 35 P.S. § 6021.705(d)(1).

The permanent closure rule operates as a binding norm, or standard of conduct, not an announcement of what the Fund intends for the future. *Norristown*, 473 Pa. at 350, 374 A.2d at 679. As such, the permanent closure rule must be promulgated as a regulation in accordance with the Commonwealth Documents Law. Because it was not, the rule is void and unenforceable. Further, the Fund lacks authority to establish the fees to be paid by the owners and operators of underground storage tanks in any way other than by regulation. 35 P.S. § 6021.705(d)(*l* ).

For the above-stated reasons, we reverse the Board and remand for the return of the capacity fee paid by the Partnership and for computation of the amount of coverage for Transportation Services' claim for remediation costs.

### *ORDER*

AND NOW, this 24th day of April, 2013, the order of the Underground Storage Tank Indemnification Board dated December 16, 2011, in the above-captioned matter is hereby REVERSED and this matter is REMANDED in accordance with the attached opinion.

Jurisdiction relinquished.