**[J-71-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| DR. TIMOTHY AND DEBRA SHROM, | : | No. 21 MAP 2022 |
| | : | |
| Appellees | : | Appeal from the Order of the |
| | : | Commonwealth Court dated |
| | : | August 5, 2021, at No. 637 CD |
| v. | : | 2020 Reversing and Remanding |
| | : | the June 22, 2020 Order of the |
| | : | Underground Storage Tank |
| PENNSYLVANIA UNDERGROUND | : | Indemnification Board at |
| STORAGE TANK INDEMNIFICATION | : | No. UT19-03-015 |
| BOARD, | : | |
| | : | ARGUED: October 25, 2022 |
| Appellant | : | |

**OPINION**

JUSTICE BROBSON                    DECIDED: April 19, 2023

This discretionary appeal concerns whether Dr. Timothy Shrom and Debra Shrom (collectively, the Shroms) are eligible under the Storage Tank and Spill Prevention Act (Act)[1] for payment from the Underground Storage Tank Indemnification Fund (Fund) for costs they incurred in remediating contamination caused by fuel releases from underground storage tanks (USTs or tanks) located on their property. The Fund concluded, and the Underground Storage Tank Indemnification Board (Board) ultimately agreed, that the Shroms were ineligible for such payment because the subject USTs were not registered with the Pennsylvania Department of Environmental Protection (DEP) as required by Section 503 of the Act[2] and the registration fees (Section 503 registration

---

[1] Act of July 6, 1989, P.L. 169, *as amended*, 35 P.S. §§ 6021.101-.2104.

[2] 35 P.S. § 6021.503.

fees) were not paid at the time of the fuel releases that gave rise to the Shroms' claim for remediation costs. The Commonwealth Court reversed the Board's decision on appeal, concluding that: (1) the Shroms were eligible to receive payment from the Fund for remediation costs under the Act; (2) the Board's holding relative to the timing of the payment of the Section 503 registration fees constituted an unlawful *de facto* regulation; and (3) contrary to the Board's finding, payment of the Shroms' claim did not appear to pose any imminent risk to the Fund's solvency. Discerning no error in the Commonwealth Court's decision, we affirm.

## I. BACKGROUND

### a. Relevant Law

To provide better context for the current dispute, we set forth a brief summary of the pertinent statutory and decisional law, beginning with the Act. The Act "is a remedial statute" that was "created to protect the well-being of the citizenry of Pennsylvania." *Centolanza v. Lehigh Valley Dairies, Inc.*, 658 A.2d 336, 406 (Pa. 1995); *MH Davis Estate Oil Co., Inc. v. Underground Storage Tank Indemnification Bd.*, 789 A.2d 398, 403 (Pa. Cmwlth. 2001), *appeal denied*, 800 A.2d 935 (Pa. 2002). Indeed, the Act's provisions and attendant regulations are to "be liberally construed in order to fully protect the public health, welfare and safety of the residents of this Commonwealth." Section 109 of the Act, 35 P.S. § 6021.109. As this Court has previously explained:

> [T]he Act is premised on the recognition that: Pennsylvania's lands and waters "constitute a unique and irreplaceable resource from which the well-being of the public health and economic vitality of this Commonwealth is assured;" these resources have been contaminated by releases from both active and abandoned storage tanks of regulated substances; contamination of this sort threatens the well-being of affected residents and must be prevented through improved safeguards on storage tank construction and installation; complete restoration of contaminated resources is difficult; and corrective action, when required, is costly. [Section 102(a)(1)-(6) of the Act,] 35 P.S. § 6021.102(a)(1)-(6). In addition, the Act is founded on the General Assembly's declaration that storage tank releases of regulated substances pose a threat to the public health and safety of the Commonwealth and that a legislative response geared toward

preventing, detecting, and providing for the prompt remediation of such releases is essential. *Id.* § 6021.102(b).

To these ends, the . . . Act sets forth a scheme for the regulation of both aboveground [storage tanks] and [USTs] that hold regulated substances. *See* [Section 103 of the Act,] 35 P.S. § 6021.103 ("Storage tank" is "[a]ny aboveground [storage tank] or [UST] which is used for the storage of any regulated substance."). In the Act, "[UST]" is a defined term, which means: "Any one or combination of tanks (including underground pipes connected thereto) which are used to contain an accumulation of regulated substances, and the volume of which (including the volume of the underground pipes connected thereto) is 10% or more beneath the surface of the ground." *Id.*

*Young's Sales & Serv. v. Underground Storage Tank Indemnification Bd.*, 70 A.3d 795, 799 (Pa. 2013) (plurality opinion) (footnote omitted).

In an effort to encourage remedial efforts whenever a release from a UST occurs, the General Assembly, through the enactment of Section 704(a) of the Act, 35 P.S. § 6021.704(a), established the Fund and directed it to reimburse owners, operators, and certified installers for the costs they incur in taking corrective action following a release from a UST. *See* Section 704(a)(1) of the Act; *Young's Sales*, 70 A.3d at 799. The Fund mostly "consists of the fees that Section 705 of the Act[, 35 P.S. § 6021.705,] authorizes the Board to assess against and collect from" owners, operators, and certified installers (Section 705 fees).[3] *Young's Sales*, 70 A.3d at 799; *see also* Section 704(a)(1) of the Act. The Section 705 fees are "set on an actuarial basis in order to provide an amount sufficient to pay outstanding and anticipated claims against the . . . Fund in a timely manner." Section 705(d)(1) of the Act. With respect to "heating oil, diesel fuel, [and] other regulated substance[s]," the Section 705 fees are assessed "based on the gallon capacity of the tank, regardless of the amount of product actually in the tank." Section 705(d)(2) of the Act; *Young's Sales*, 70 A.3d at 796 n.2.

---

[3] In addition to the fees assessed against owners, operators, and certified tank installers under Section 705(d) of the Act, "monies flow into the Fund through the imposition of penalties for non-payment of fees or fraudulent reimbursement claims, as well as investment returns." *Young's Sales*, 70 A.3d at 799 n.5 (citing Section 704(a)(1) of the Act).

In addition to assessing the Section 705 fees, "the Board [also] administers the process by which claims for reimbursement from the Fund are made and paid." *Young's Sales*, 70 A.3d at 799. All claims that the Board determines to be eligible for reimbursement from the Fund must "be paid upon receipt of information clearly showing that reimbursable claim costs are reasonable, necessary and directly related to the release from the storage tank that is the subject of the claim." Section 705(b) of the Act. "The Act imposes a heavy burden of proof on a claimant seeking coverage from the Fund" for the costs incurred in remediating contamination caused by releases of regulated substances from USTs. *Luther P. Miller, Inc. v. Underground Storage Tank Indemnification Bd.*, 965 A.2d 398, 402 (Pa. Cmwlth. 2009). In that regard, a claimant seeking payment from the Fund for remediation costs must satisfy the eligibility requirements set forth in Section 706 of the Act, 35 P.S. § 6021.706, which provides:

> In order to receive a payment from the . . . Fund, a claimant shall meet the following eligibility requirements:
>
> (1) The claimant is the owner, operator[,] or certified tank installer of the tank which is the subject of the claim.
>
> (2) The current fee required under [S]ection 705 has been paid.
>
> *(3) The tank has been registered in accordance with the requirements of [S]ection 503.*
>
> (4) The owner, operator[,] or certified tank installer has obtained the appropriate permit or certification as required under [S]ections 108, 501 and 504 [of the Act, 35 P.S. §§ 6021.108, 6021.501, 6021.504].
>
> (5) The claimant demonstrates to the satisfaction of the [B]oard that the release that is the subject of the claim occurred after the date established by the [B]oard for payment of the fee required by [S]ection 705(d).
>
> (6) Additional eligibility requirements which the [B]oard may adopt by regulation.

(Emphasis added.) With respect to the third eligibility requirement—*i.e.*, UST registration—Section 503 of the Act provides, in pertinent part:

> (a) Requirements.--Every owner of [a UST], except as specifically excluded by policy or regulation of [DEP], shall register with [DEP] each

[UST] by completing and submitting the form provided by [DEP] and by paying the registration fee prescribed by [DEP] for each [UST] within three months of the effective date of this [A]ct. . . . It shall be unlawful for any owner or operator to operate or use, in any way, any [UST] that has not been registered as required by this section.

(b) Prohibitions.--After 12 months from the effective date of this [A]ct, it shall be unlawful to sell, distribute, deposit or fill [a UST] with any regulated substance unless the [UST] is registered as required by this section. Any person who, on or after the effective date of this subsection, knowingly sells, distributes, deposits or fills any [UST] in violation of this subsection prior to the discovery of a release shall be liable for any release from the [UST], in addition to the remedies provided in [S]ection 1302 [of the Act, 35 P.S. § 6021.1302]. It shall be a defense to an enforcement action under this subsection regarding delivery to an unregistered tank that the tank in question had been registered in a prior year. Within 12 months of the effective date of this [A]ct, [DEP] shall have available for the general public an easily distinguishable visual system, such as a sticker, to identify tanks with a current sticker as part of enforcement by [DEP].

(c) Use of registration fees.--Registration fees collected by [DEP] shall be used to fund the development and operation of the storage tank programs established by this [A]ct.

In sum, and most relevant here, there are two types of fees that must be paid for a claimant to be eligible for reimbursement from the Fund under Section 706 for the costs incurred in remediating contamination caused by releases of regulated substances from USTs—Section 705 fees and Section 503 registration fees.

Turning to the pertinent case law, there appears to be only four appellate court decisions that address the payment of Section 705 fees or Section 503 registration fees as an eligibility requirement for the payment of remediation costs under Section 706 of the Act—*Young's Sales*; *MH Davis*; *J.D. Pickens v. Underground Storage Tank Indemnification Board*, 890 A.2d 1117 (Pa. Cmwlth. 2006); and *Luther P. Miller*. In *Young's Sales*, this Court considered whether the eligibility requirement set forth in Section 706(2) of the Act, which requires the Section 705 fees to have been paid, applies on a per tank basis. *Young's Sales*, 70 A.3d at 796, 799. Stated another way, this Court had to decide whether, in a situation where multiple USTs were located on the subject property and the Section 705 fees had been paid on some but not all of those USTs, the payment of the Section 705 fees on just those USTs involved in the release was sufficient

to entitle the claimant to the payment of remediation costs under Section 706. *See id.* at 796-98. Ultimately, in a plurality decision, this Court determined that "the tank fee payment eligibility requirement [set forth] in Section 706(2) does not apply on a per tank basis"—*i.e.*, to be eligible for the payment of remediation costs under Section 706, the Section 705 fees had to be paid on all of the USTs. *Id.* at 803. This Court further concluded that, because the Section 705 fees had not been paid on all of the USTs located on the subject property, the claimant did not meet the eligibility requirement set forth in Section 706(2), and, therefore, the Fund's denial of the claimant's claim was proper. *Id.*

In *MH Davis*, the Commonwealth Court considered the question of when the Section 705 fees had to be paid to satisfy the eligibility requirement set forth in Section 706(2) of the Act—*i.e.*, at the time of the discovery of the release of the regulated substance from the UST or at the time of the submission of the claim. *MH Davis*, 789 A.2d at 401-04. After review, the Commonwealth Court held that, in order to meet the Section 706(2) eligibility requirement, the Section 705 fees had to have already been paid at the time that the release was discovered. *Id.* at 404. In so holding, the Commonwealth Court explained:

> Assuming arguendo, that this [c]ourt accepted [the p]etitioners' interpretation of Section 706(2) . . . , the result would be that a claimant was eligible for retroactive coverage even where there was a failure to make one payment or no payments at all so long as all fees due and owing were paid at the time the claim was submitted. Such an outcome would countenance a situation where coverage is provided after loss is incurred and prior to payment of fees, allowing [UST] owners and operators to pay fees at their leisure. Clearly, the General Assembly did not intend such a result where it specifically mandated the participation of [UST] owners and operators in the . . . Fund and where failure to do so would compromise the financial stability of the . . . Fund.

*Id.* at 403-04.

Following *MH Davis*, in *J.D. Pickens*, the Commonwealth Court was tasked with determining whether "current fee," as that phrase is used in Section 706(2) of the Act,

included not only those Section 705 fees due and owing for the year in which the release was discovered but also any Section 705 fees that remained unpaid from prior years. *J.D. Pickens*, 890 A.2d at 1117-19. Ultimately, the Commonwealth Court held that the phrase "current fee" included all Section 705 fees owed in connection with the subject USTs, including any fees that were past due from prior years. *Id.* at 1120. In so holding, the Commonwealth Court explained:

> [I]f before us was the interpretation of the bare term "current fee," we would agree . . . that the term "current fee" only means the fee presently due and owing. However, Section 706(2) . . . does not just require that the "current fee" be paid, but also that "[t]he current fee required under [S]ection 705 has been paid." What is a "current fee" then, is what is owed under Section 705.
>
> Along with providing who is responsible for the payment of fees and where the fees are to be paid, Section 705(e) of the . . . Act . . . also provides in relevant part:
>
> > A person who fails or refuses to pay the fee or a part of the fee by the date established by the [B]oard may be assessed a penalty of 5% of the amount due which shall accrue on the first day of delinquency and be added thereto. Thereafter, on the last day of each month during which any part of any fee or any prior accrued penalty remains unpaid, an additional 5% of the then unpaid balance shall accrue and be added thereto.
>
> What Section 705(e) . . . does, much like a credit card account, is to require the amount of the past due fee to be "rolled over" with interest and have a penalty added each month when a [Section 705] fee is not timely paid, making "all fees," a "current fee" owed to the Fund even though it represents the amount of fees assessed for previous years. Because Section 706(2) . . . conditions eligibility for reimbursement on the payment of the current fee required to be paid under Section 705(e), which makes "current" past due fees, the Board properly determined that the non-payment of [Section 705] fees for [prior] years . . . makes the [petitioner] ineligible for reimbursement of its remediation costs.

*Id.* at 1120.

In *Luther P. Miller*, the Commonwealth Court considered, *inter alia*, whether inactive USTs must be registered under Section 503 of the Act to be eligible for the payment of remediation costs under Section 706 of the Act. *Luther P. Miller*, 965 A.2d at 399. There, the subject USTs had been used to store gasoline from 1992 to 1999. *Id.* at 400. When the claimant stopped using the USTs in 1999, it removed as much gasoline

from the USTs as was practicable, but some gasoline residue, which was unfit for resale, remained. *Id.* The claimant did not, however, file temporary closure paperwork with DEP, and the USTs' registration eventually expired on October 4, 2002. *Id.* Thereafter, on January 13, 2006, while the USTs were being removed from the subject property, a release was discovered. *Id.* at 401. At the time of such discovery, the USTs were not registered, and the Section 503 registration fees were not paid. *Id.* Nevertheless, on January 19, 2006, the claimant filed a claim for remediation costs with the Fund. *Id.* Thereafter, on April 18, 2006, after receiving an enforcement letter from the Pennsylvania Office of Attorney General (OAG), the claimant paid the delinquent Section 503 registration fees. *Id.* By letter dated September 6, 2006, the Fund denied the claim, in part, "because the tanks were not registered and the [Section 503] registration fees were not paid." *Id.* The Board affirmed the Fund's determination, and the claimant appealed to the Commonwealth Court. *Id.* at 402.

Before the Commonwealth Court, the claimant contended that it was eligible to make a claim under Section 706 of the Act because "the key time period for the registration of tanks and the payment of [Section 503 registration] fees to the Fund is during the time the tanks are in operation." *Id.* In other words, the claimant maintained that, "once the product was removed from the tanks and the tanks were taken out of service, they no longer needed to be registered under Section 503 of the Act because the tanks were no longer 'underground storage tanks' as defined in the Act." *Id.* at 403. The Commonwealth Court rejected this "contorted interpretation of the Act," holding that, to be eligible for the payment of spill remediation costs under Section 706, the subject USTs must be registered and the Section 503 registration fees must be paid regardless of whether such USTs are actively in use. *Id.* at 405. As a result, the Commonwealth Court "agree[d] with the Board that the tanks at issue . . . were required to be registered in

accordance with Section 503," and the claimant's "failure to comply with the registration requirements" rendered "it ineligible to make a claim for reimbursement from the Fund." *Id.*

### b. The Matter *Sub Judice*

Turning to the present matter, we derive the relevant facts—which are not in dispute—from the parties' joint stipulations as submitted in the proceedings below and aptly summarized by the Commonwealth Court:

> The subject property is located at 435 West Fourth Street, Quarryville, Pennsylvania (the Property). Mrs. Shrom inherited the Property following the death of her mother in 2014. At that time, the Property was leased and operated as a convenience store, Subway franchise, and retail fuel sales facility. That lease was pursuant to an oral agreement between Mrs. Shrom and Edward Boornazian or his solely owned limited liability company, Quarryville Subway LLC (Tenant). When Mrs. Shrom inherited the Property, it contained five USTs situated side[-]by[-]side: three gasoline tanks, a diesel tank, and a kerosene tank. Prior to 2014, Jerome H. Rhoads, Inc., was registered with [DEP] as the owner and operator of the USTs, but[,] on October 16, 2014, that corporation transferred its interest in the [USTs] to Tenant.
>
> On February 3, 2015, Tenant submitted an amendment to the USTs' registration to . . . DEP, reflecting Tenant's ownership thereof. Approximately one year later, in early 2016, Tenant ceased pumping fuel at the Property, and[,] on May 17, 2016, Tenant amended the USTs' registration with . . . DEP to reflect an out-of-service status. In April 2017, Tenant vacated the Property, leaving the USTs behind. On June 4, 2017, the registration for the USTs expired because the [Section 503] registration fee[s were] unpaid. . . . DEP sent letters to Tenant at the Property concerning the unpaid [Section 503] registration fee[s] in July, August, and September of 2017. On October 13, 2017, . . . DEP referred the debt to [OAG]. . . . OAG sent letters concerning the unpaid [Section 503 registration] fees to the Property in October and November of 2017. Neither . . . DEP's nor . . . OAG's letters were returned as undeliverable, but the Shroms did not reside at the Property and did not open mail addressed to Tenant. Thus, the Shroms did not read any of the notices concerning the unpaid [Section 503] registration fee[s]. Neither . . . DEP nor . . . OAG directly notified the Shroms of the unpaid [Section 503] registration fee[s].

In 2017, the Shroms engaged a contractor to remove the USTs. On September 12, 2017, the Shroms' contractor submitted a tank system closure notification form to . . . DEP, which called for a complete system closure and the removal of all five USTs. Dr. Shrom signed the form as the tank system owner, although he later asserted that this was inadvertent because neither he nor Mrs. Shrom ever owned the USTs. Although the DEP permanent tank closure planning checklist calls for verification that the USTs are registered, no one registered the [USTs] at that time.

On December 28, 2017, during the removal of the USTs, a diesel fuel release was discovered. On January 5, 2018, additional gasoline contamination was discovered on the Property. The Shroms' contractor proceeded to remove the USTs and the contaminated soil. At the time that the release was discovered, all [Section 705 fees] payable to the Fund were current, because no such fees were required while the tanks were in out-of-service status. However, the [Section 503] registration fee[s] remained unpaid, and the [USTs] accordingly remained unregistered.

On January 5, 2018, the Shroms' environmental consultant reported the release to the Fund. The Fund assigned the claim to its third-party claims administrator . . . to investigate the Shroms' eligibility for coverage from the Fund. During that investigation, the Shroms' environmental consultant informed them that the [Section 503] registration fees had not been paid for 2017. The following day, the Shroms paid the outstanding [Section 503] registration fees to . . . OAG's collection agent.

In a letter dated May 16, 2018, the Fund denied coverage for the Shroms' claim on the basis that the USTs were not registered, and the [Section 503] registration fee[s were] not paid, at the time that the release was discovered. The Shroms sought review of that decision with the Fund's Executive Director, who affirmed the denial of coverage in a letter dated February 21, 2019. The Shroms then requested a formal administrative hearing, and a Presiding Officer was appointed to adjudicate the matter. The Presiding Officer agreed that the Shroms were ineligible for compensation from the Fund[] and submitted a Proposed Report and Recommendation [(Report)] to that effect with the Board.

*Shrom v. Pa. Underground Storage Tank Indemnification Bd.*, 261 A.3d 1082, 1085-86

(Pa. Cmwlth. 2021) (footnotes omitted) (citations omitted).

The Shroms filed exceptions to the Presiding Officer's Report with the Board.

Upon consideration of that Report, the Shroms' exceptions thereto, the Fund's response,

and the underlying record, the Board issued an Adjudication and Order, which essentially

denied the Shroms' exceptions, adopted the Presiding Officer's Report in full, and affirmed the Fund's denial of coverage for the Shroms' claim. In so doing, the Board relied upon *Young's Sales*, *MH Davis*, *J.D. Pickens*, and *Luther P. Miller*, all of which the Board deemed to be controlling of the issue before it—*i.e.,* "whether the Shroms [were] eligible for [Fund] benefits when the release giving rise to their claim was discovered before the fees were paid to register the [USTs] situated on the . . . [P]roperty." (Reproduced Record (R.R.) at 280a.) Based upon its review and interpretation of those decisions, the Board concluded that, in order for a claimant to be eligible for the payment of remediation costs from the Fund under Section 706 of the Act, both the Section 705 fees and the Section 503 registration fees had to be paid prior to the discovery of the release giving rise to the claim. The Board further concluded that, because the Section 503 registration fees for the subject USTs were not paid at the time that the release was discovered at the Property, the Shroms were not eligible for the payment of remediation costs from the Fund. The Shroms thereafter petitioned the Commonwealth Court for review of the Board's Adjudication and Order.

In a unanimous, published opinion, a three-judge panel of the Commonwealth Court reversed the Board's Adjudication and Order. At the outset, the Commonwealth Court observed that no resolution of the instant dispute could be found in existing precedent, because, contrary to the Board's opinion regarding the purportedly controlling nature of *Young's Sales*, *MH Davis*, *J.D. Pickens*, and *Luther P. Miller*, those decisions concerned the payment of Section 705 fees, not Section 503 registration fees, and/or were distinguishable. In making that observation, the Commonwealth Court first explained that the cases addressing Section 705 fees—namely, *Young's Sales*, *MH Davis*, and *J.D. Pickens*—were "noteworthy only inasmuch as they highlight a distinction . . . in the statutory language used to refer to [S]ection 705 fees and

[S]ection 503 registration fees." *Shrom*, 261 A.3d at 1090. Moving on to *Luther P. Miller*, the only case relied upon by the Board that concerned Section 503 registration fees, the Commonwealth Court noted the factual similarities—*i.e.*, in both this case and *Luther P. Miller* the Section 503 registration fees were not paid until after the release giving rise to the claim was discovered. The Commonwealth Court, however, made a critical distinction: *Luther P. Miller* did not address and/or analyze the timing of the payment of the Section 503 registration fees because the claimant in that case centered its arguments on the inactivity of the subject USTs at the time the release was discovered. In other words, the fact that the Section 503 registration fees were not paid until after the release giving rise to the claim was discovered was not the basis for the Commonwealth Court's decision in *Luther P. Miller*.

Recognizing that neither *Luther P. Miller*, nor the cases addressing Section 705 fees, were dispositive of the issue presented in this case, the Commonwealth Court turned to the language of the Act itself. After acknowledging the remedial nature of the Act, the Commonwealth Court noted that, unlike with respect to Section 705 fees, "the eligibility criteria set forth in [S]ection 706 of the Act do not state expressly *when* the registration requirements must be met, or [the Section 503] registration fee[s] paid, relative to discovery of a release or the filing of a claim." *Id.* at 1091 (emphasis in original). In support, the Commonwealth Court explained that "Section 706 not only specifies that the 'current' fee under [S]ection 705 must be paid, but it further requires '*that the release that is the subject of the claim occurred after the date established by the [B]oard for payment of the fee required by [S]ection 705(d).*'" *Id.* (alteration in original) (emphasis in original) (quoting Section 706(5) of the Act). The Commonwealth Court determined that, as a matter of statutory interpretation, these distinctions were important because, "if the General Assembly intended to require [the S]ection 503 registration fees to be paid before

the release giving rise to a claim, it would have expressly provided as much, as it did with respect to [S]ection 705 fees." *Id.* at 1092 (noting that, when applying principles of statutory construction, courts must listen not only to what statute says but also what it does not say and that, under doctrine of *expressio unius est exclusio alterius*, inclusion of specific matters in statute implies exclusion of other matters).

The Commonwealth Court continued that, despite Section 706 of the Act's different treatment of Section 705 fees and Section 503 registration fees, the Fund treated them identically, thereby applying "an eligibility criterion to the Shroms' claim that does not appear on the face of the statute." *Id.* The Commonwealth Court noted that the Board admitted this fact by acknowledging in its Adjudication and Order that neither Section 706 nor the Fund's regulations expressly provide that the subject USTs had to be registered before the discovery of the release giving rise to the claim. The Commonwealth Court pointed out, however, that the Board seemingly changed its position before the Commonwealth Court and argued that "the subject USTs were not registered and the required registration fee[s were] not paid at the time the releases were discovered, *as required by the clear and unambiguous language* of the governing Act." *Id.* (emphasis in original) (quoting Board's Commonwealth Ct. Br. at 7). The Commonwealth Court explained that, while it is "certainly . . . clear" that Section 706 requires the subject USTs to be registered, "it is equally clear" that Section 706 does not specify the sequence and timing of that registration or the payment of the Section 503 registration fees. *Id.*

Next, the Commonwealth Court turned its attention to the Shroms' "overarching contention" that their claim was denied pursuant to an unlawful, *de facto* regulation. *Id.* at 1092-95. In addressing that contention, the Commonwealth Court noted that "[t]he Fund's rule governing the timing of the payment of [Section 503] registration fees has

much in common with the permanent closure rule" that the Commonwealth Court previously invalidated in *Transportation Services, Inc. v. Underground Storage Tank Indemnification Board*, 67 A.3d 142 (Pa. Cmwlth. 2013) (holding that Fund's rule requiring Section 705 fees to be paid until permanent closure form was filed with DEP functioned as regulation, not statement of policy, and, therefore, had to be promulgated in accordance with what is commonly referred to as Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102-1602, 45 Pa. C.S. §§ 501-907). *Id.* at 1094. More specifically, the Commonwealth Court explained: (1) the timing rule, like the permanent closure rule, "establishes a standard of conduct which the Fund applies in all situations now and in the future" without any discretion to deviate therefrom, which is indicative of a "binding norm;" (2) the timing rule, again like the permanent closure rule, "is not based in the language of the Act or the regulations promulgated thereunder;" and (3) the unambiguous language of Section 706(6) of the Act requires the Board to adopt a regulation if the "Fund wishes to apply the same timing requirements to [S]ection 503 registration fees that [S]ection 706(5) applies to [S]ection 705 fees." *Id.* (quoting/citing *Transp. Servs.*, 67 A.3d at 155).

The Commonwealth Court acknowledged that the Board attempted to explain its failure to promulgate a regulation by highlighting Section 706(6)'s use of the word "may:" "[t]he use of the word 'may' indicates recognition by the [General Assembly] that the Fund should be afforded some degree of deference and discretion in deciding how best to operate the [Fund] program, including when and whether to promulgate regulations" and "the fact that [the Board] has not sought to promulgate an additional eligibility requirement stating that a tank must be registered when the release is discovered . . . does not . . . invalidate the basis underlying the denial of the Shroms' claim." *Id.* at 1094-95 (some alterations in original) (quoting Board's Adjudication and Order at 14). The

Commonwealth Court opined, however, that this rationale was "problematic both as a matter of administrative law and of statutory interpretation." *Id.* at 1095. The Commonwealth Court explained:

> Certainly, the [General Assembly's] provision of authority to an agency to promulgate regulations entails a degree of trust in the wise use of the agency's discretion to do so. However, the use of the word "may" in [S]ection 706(6) did not grant a license to adopt unwritten rules of exclusion from eligibility for payment from the Fund. The Board's reading of [S]ection 706(6) would allow it to impose additional eligibility criteria that it may *or may not* adopt by regulation. However, under a plain reading of the statute, if the Board wishes to adopt "[a]dditional eligibility requirements," such as the rule applied in the instant case, it has the authority and discretion to do so "by regulation."

*Id.* at 1095 (some alterations in original) (citation omitted). For all of these reasons, the Commonwealth Court concluded:

> The rule applied to the USTs on the Shroms' Property, disqualifying them from eligibility for payment from the Fund, is not found in any statute, regulation, or court decision. However, it "operates as a binding norm, or standard of conduct, not an announcement of what the Fund intends for the future." As such, it "must be promulgated as a regulation in accordance with the Commonwealth Documents Law." "Because it was not, the rule is void and unenforceable."

*Id.* (citations omitted) (quoting *Transp. Servs.*, 67 A.3d at 156).

The Commonwealth Court also rejected the Board's position that Section 706 of the Act is ambiguous and, therefore, its interpretation thereof must be given judicial deference. In so doing, the Commonwealth Court explained that judicial deference was not warranted because "[S]ection 706 . . . makes clear that [S]ection 705 fees are to be treated differently than [S]ection 503 registration fees, inasmuch as it specifies that the former must be paid before the 'release that is the subject of the claim occurred,' but is silent as to the latter." *Id.* (internal citation omitted). The Commonwealth Court further explained that, "even if some portion of [S]ection 706 . . . could be deemed ambiguous, there is a distinction between the mere interpretation of an ambiguous provision and the

addition of extra-statutory requirements that require adoption by regulation" and "that any deference that would be owed to the Board's position is more than offset by the General Assembly's express direction that the Act 'shall be liberally construed in order to fully protect the public health, welfare and safety of the residents of this Commonwealth.'" *Id.* (quoting Section 109 of the Act).

The Commonwealth Court further emphasized that the facts of this matter serve as an example as to why liberal construction of the Act is essential. It explained:

> The USTs on the Shroms' Property have contaminated the "lands" of this Commonwealth, a "unique and irreplaceable resource from which the well-being of the public health and economic vitality of this Commonwealth is assured." The Shroms have sought to remediate this contamination, and[,] as the General Assembly recognized, "the cost is extremely high." By the time the Fund denied their claim, the Shroms had incurred costs of $170,745.50. Unsurprisingly given that figure, they do not plan to continue remediating the Property unless they can receive aid from the Fund. The Fund was established for the purpose of providing this aid. If the requirements for eligibility for payment from the Fund are read too strictly—or if unwritten requirements are superimposed thereon—those in the Shroms' position may find themselves financially unable to remediate the damage caused by ruptures of USTs, posing "a grave threat to the health of affected residents." In light of the importance of the Act's express goals, and construing the Act liberally to protect public health, safety, and welfare, as we must, we will not read any additional eligibility requirements into [S]ection 706 [of the Act] that do not appear in the text thereof, or in the regulations duly promulgated thereunder.

*Id.* at 1096 (citations omitted).

Lastly, the Commonwealth Court rejected "the Board's arguments concerning the purported risk that a payment to the Shroms would pose to the Fund's solvency." *Id.* In support thereof, the Commonwealth Court noted that there is an additional distinction between Section 705 fees and Section 503 registration fees that it had not previously discussed: Section 705 fees are used to pay claims, while Section 503 registration fees are not. *Id.* It explained:

The fees specified under [S]ection 705 [of the Act] are "set on an actuarial basis in order to provide an amount sufficient to pay outstanding and anticipated claims against the [Fund] in a timely manner" and "to meet all other financial requirements of the [B]oard." By contrast, under [S]ection 503 [of the Act], tank registration fees are "collected by . . . [DEP]" and "shall be used to fund the development and operation of the storage tank programs established by this [A]ct," but not directly to pay claims against the Fund. In light of this distinction, paying the Shroms' claim would not appear to pose any imminent risk to the Fund's solvency. The Board recognizes the distinction[] but argues that the Fund uses data provided to it by . . . DEP to maintain the contact information of tank owners, and if those tank owners do not maintain the registration at all times, . . . "DEP's data would be skewed, leading to faulty fee revenue projections that could jeopardize [the Fund's] ability to pay claims and maintain financial stability." This may be true. However, if such consequences are likely to flow from the gap in the statute that we have discussed herein, then it would be a worthwhile endeavor to resolve the matter through a duly promulgated regulation, thereby placing the public on notice of the consequence that will follow from the failure to pay a [Section 503] registration fee within the time frame that the Fund prefers.

*Id.* at 1096-97 (some alterations in original) (citations omitted).[4]

---

[4] We would be remiss if we did not acknowledge that one of the eligibility requirements for the payment of remediation costs from the Fund under Section 706 of the Act is that "[t]he claimant is the owner, operator[,] or certified tank installer of the tank which is the subject of the claim." Section 706(1) of the Act. Throughout the underlying proceedings, the Shroms repeatedly asserted that they were not the owners of the subject USTs. Interestingly, however, the Shroms' arguable failure to satisfy this eligibility requirement was not the basis of the Fund's denial of their claim, asserted by the Fund as an alternative basis for its denial of their claim, and/or pursued by the Fund and/or the Board on appeal. (*See, e.g.*, R.R. at 284a-85a ("The owner/operator criterion was not . . . a basis for the Fund's denial of the Shroms' claim[] and was not at issue in this appeal."); R.R. at 323a (noting that owner/operator eligibility requirement "was not applied by [the Fund's] third party . . . administrator or Executive Director in denying coverage for the [Shroms'] claim[] and is not at issue in these proceedings").) For these reasons, we will not address the owner/operator eligibility requirement in any further detail in this opinion but note that our decision today should in no way be read to establish that a claimant that fails to satisfy the owner/operator eligibility requirement is somehow still entitled to receive payment from the Fund for remediation costs under Section 706.

## II. ANALYSIS

### a. Issues

The Board filed a petition for allowance of appeal seeking this Court's discretionary review, which we granted to consider the following three issues as stated by the Board:

a. In a matter of first impression before this Court and of substantial public importance, did the Commonwealth Court err in reversing the decision of the [Board,] which correctly held that [the Shroms] failed to satisfy their heavy burden of establishing eligibility for the payment of remediation costs by the . . . Fund where it is undisputed that the [USTs] on the [Shroms' P]roperty were not registered and the required registration fee was not paid at the time the release was discovered?

b. Did the Commonwealth Court's [o]rder conflict with other relevant appellate court authority, particularly *Luther P. Miller* . . . , which is substantially factually identical to the instant case, and with other existing case, statutory, and regulatory law, in its characterization of the Board's denial of the Shroms' claim for remediation costs due to the failure to register the USTs as an unpromulgated, *de facto* regulation?

c. In a matter of substantial public importance due to its potential to result in the Fund's insolvency, did the Commonwealth Court err in rejecting the Board's finding that the Fund relies upon [DEP] registrations in billing the necessary fees to keep the Fund solvent?

*Shrom v. Pa. Underground Storage Tank Indemnification Bd.*, 272 A.3d 1290 (Pa. 2022) (per curiam).

### b. Standard of Review

Appellate review of agency decisions "is restricted to determining whether there has been a constitutional violation, an error of law, or a violation of agency procedure, and whether necessary findings of fact are supported by substantial evidence." *Dep't of Labor & Indus. v. Workers' Comp. Appeal Bd. (Crawford & Co.)*, 23 A.3d 511, 514 (Pa. 2011). Insofar as the issues raised herein implicate questions of law—particularly by requiring us to engage in statutory interpretation—our standard of review is *de novo*

and our scope of review is plenary. *Sch. Dist. of Phila. v. Workers' Comp. Appeal Bd. (Hilton)*, 117 A.3d 232, 241 (Pa. 2015) (explaining that issues raised on appeal involved statutory construction "and thereby constitute[d] questions of law over which our standard of review is *de novo* and our scope of review is plenary"). To the extent this appeal concerns whether there is substantial evidence to support the Board's findings of fact, "'[s]ubstantial evidence' means 'such relevant evidence that a reasonable mind might accept as adequate to support a conclusion.'" *Kerr v. Pa. State Bd. of Dentistry*, 960 A.2d 427, 436 (Pa. 2008) (quoting *Sell v. Workers' Comp. Appeal Bd. (LNP Eng'g)*, 771 A.2d 1246, 1250 (Pa. 2001)).

### c. Parties' Arguments

The Board contends that its denial of the Shroms' claim for the payment of remediation costs from the Fund was consistent with existing statutory, regulatory, and decisional law, and, therefore, the Commonwealth Court committed an error of law by reversing that decision and concluding that the Fund's rule regarding the timing of the payment of the Section 503 registration fees constituted a *de facto* regulation. In support, the Board sets forth three main issues/arguments. First, the Board argues that the Commonwealth Court ignored the clear and unambiguous eligibility requirements set forth in Section 706 of the Act. Relying upon Sections 245.41(a) and 245.42(b)-(c), (f)-(g) of DEP's regulations[5] pertaining to the registration of USTs, the Board maintains that "[t]he

---

[5] 25 Pa. Code §§ 245.41(a), 245.42(b)-(c), (f)-(g). Section 245.41(a) of DEP's regulations provides: "Tank owners shall properly register each storage tank by meeting the requirements in this section and paying the registration fee prior to registration certificate expiration as required by § 245.42 (relating to tank registration fees)." 25 Pa. Code § 245.41(a). Section 245.42 of DEP's regulations provides, in pertinent part:

> (b) Annual registration fees to be paid by owners of [USTs] are established under [S]ection 502 of the [A]ct (35 P.S. § 6021.502) as $50 for each [UST].

> (c) [DEP] will issue an invoice to the tank owner after receipt of a complete registration form under § 245.41(c) (relating to tank registration

(continued…)

language of the Act is clear that, in order to receive payment from the Fund, the tank must be registered in accordance with Section 503" of the Act and, "[i]n order to be registered in accordance with Section 503, the registration fee must be paid no later than the expiration of the certificate of registration." (Board's Br. at 14-15.) The Board, therefore, suggests that, given that the subject USTs were not registered in accordance with Section 503 at the time that the release was discovered, the Shroms were ineligible to receive payment from the Fund under the plain language of Section 706 and the associated regulations. The Board maintains that the Commonwealth Court's prior decision in *Bergey v. Foster*, 604 A.2d 1209 (Pa. Cmwlth. 1992) (holding that individual injured in motor vehicle collision was not eligible to receive benefits from Catastrophic Loss Trust Fund (CAT Fund) because his motor vehicle was not registered in accordance with Motor Vehicle Financial Responsibility Law, 75 Pa. C.S. §§ 1701-1799.7, and his CAT Fund fee was not paid at time of motor vehicle collision), is instructive on this issue. On that point, the Board contends that the Shroms advanced an argument similar to that of the appellant in *Bergey*, but here, unlike in *Bergey*, the Commonwealth Court "erroneously disregarded the plain meaning of the words of the Act in determining that the Shroms are eligible for [Fund] coverage despite the undisputed fact that the USTs were not registered in accordance with Section 503 of the Act." (*Id.* at 17.)

___

requirements). The tank owner shall remit the appropriate fee upon receipt of the invoice.

. . . .

(f) [DEP] will issue an annual invoice to the tank owner for the annual renewal of all regulated tanks at the owner's facility once per year, at least 60 days prior to the expiration of the certificate of registration.

(g) Fees are payable no later than 60 days after the invoice date[] and will be considered delinquent 90 days after the invoice date.

25 Pa. Code § 245.42(b)-(c), (f)-(g).

The Board further maintains that the Commonwealth Court "erroneously conflated the eligibility requirements at Sections 706(2) and 706(5) of the Act" as a means to distinguish Section 705 fees from Section 503 registration fees. (*Id.* at 17.) In the Board's view, Section 706(2) "contains no language expressly requiring that the current fee be paid prior to the discovery of a release," yet the *MH Davis* court "held that those fees are required to have been paid before the discovery of a release in order for a claimant to be eligible." (*Id.* at 18.) The Board, therefore, posits that, contrary to the Commonwealth Court's determination, Section 706(5) does not specify that the Section 705 fees must be paid before the release is discovered. Rather, Section 706(5) simply requires a claimant to demonstrate that the release occurred after the date established by the Board for the payment of the Section 705 fees; it is the relevant appellate precedent that establishes that Section 705 fees must be paid before the discovery of the release giving rise to the claim.

The Board also suggests that the "purported express provision" of Section 706(5) that the Commonwealth Court relied upon to apply the doctrine of *expressio unius est exclusio alterius* and conclude that, "if the General Assembly intended to require Section 503 registration fees to be paid before the release giving rise to the claim, it would have expressly provided as much 'as it did with respect to Section 705 fees,'" simply does not exist. (*Id.* at 19-20 (quoting *Shrom*, 261 A.3d at 1092).) The Board maintains that, when construing the words and phrases of the Act and the associated regulations according to rules of grammar and their common and approved usage, one must conclude that "the term 'has been registered' means that the USTs at issue were required to be registered at the time the release was discovered in order for the Shroms to be eligible for [Fund] coverage." (*Id.* at 20.) To that aim, the Board contends that the Commonwealth Court's construction of Section 706(3) "eviscerate[s] the plain meaning

of [Section 706 of] the Act" by rendering the UST "registration requirement practically meaningless." (*Id.* at 20-21.)

Second, the Board argues that the Commonwealth Court's decision in this matter "conflicts with relevant appellate court authority, particularly *Luther P. Miller*." (*Id.* at 21.) In that regard, the Board contends that the Commonwealth Court's attempt to distinguish *Luther P. Miller*—which it suggests has "essentially identical" facts to those presented here—is based upon a faulty analysis. (*Id.* at 22-26.) In the Board's opinion, "the timing of [the] registration of the USTs in accordance with Section 503 [of the Act] was clearly at issue in *Luther P. Miller*," and "the arguments underlying why the USTs were not registered and [why] the fee was not paid in *Luther P. Miller* are irrelevant to the instant case." (*Id.* at 24, 26 (emphasis omitted).) The Board suggests that the analysis under *Luther P. Miller* is much simpler:

> Ultimately, the claimant in *Luther P. Miller* did not pay its Section 503 [registration] fee[s] or register its tanks until after the release was discovered and its claim had been submitted to [the Fund], and, therefore, coverage was denied. Likewise, in this case[,] the USTs were not registered when the releases were discovered, and the Shroms did not pay the Section 503 [registration] fee[s] until well after the releases were discovered and their claim had been submitted to [the Fund]. Accordingly, their claim was correctly denied by the Board, and the Board's decision was erroneously reversed by the Commonwealth Court.

(*Id.* at 26.)

The Board further maintains that the Commonwealth Court, based solely on the distinction between Section 705 fees and Section 503 registration fees, disregarded well-established precedent establishing that eligibility for the payment of remediation costs from the Fund under Section 706 of the Act "is determined as of the time the release is discovered." (*Id.* at 22.) The Board contends that, in doing so, the Commonwealth Court failed to apply the logic from its prior decisions in *MH Davis* and *J.D. Pickens* with respect to the payment of Section 705 fees to the payment of Section 503 registration

fees.  The Board also argues that the Commonwealth Court erred by relying upon its prior

decision in *Transportation Services* to conclude that the Board's rule regarding the timing

of the payment of Section 503 registration fees constituted a *de facto* regulation.  In the

Board's view, *Transportation Services* has no application here because the Fund

"properly denied the Shroms' claim based upon the eligibility requirements of the Act and

regulations promulgated thereunder and the cases construing those eligibility

requirements, and not pursuant to any other purported [Fund] regulation or rule, *de facto*

or otherwise."  (*Id.* at 29 (emphasis omitted).)  The Board also suggests that, "if the

Commonwealth Court's decision is affirmed and a tank owner is permitted to pay the

[Section 503] registration fee[s] after discovering a release, it would be akin to a

homeowner purchasing insurance coverage for a fire loss after the fire has occurred" and

that, "[i]n essence, the Commonwealth Court's decision . . . has turned the tank

registration obligation into a claim processing fee rather than a statutory requirement for

eligibility for coverage."  (*Id.* at 30-31.)

Third, the Board argues that the Commonwealth Court "erroneously rejected the

Board's finding that registration of USTs in accordance with Section 503 [of the Act] is

necessary to ensure [the Fund's] financial integrity" and, in so doing, improperly rejected

the substantial evidence of record supporting that finding. (*Id.* at 32.) The Board explains:

> [A]lthough [the Fund] does not receive [the Section 503] registration fees, it
> relies upon tank owner and facility information provided by DEP pertaining
> to regulated USTs, which is used by [the Fund] to invoice UST owners.
> Importantly, this registration information promotes financial stability and
> allows tank owners and operators to comply with their financial
> responsibility requirements under the Act and the regulations.  Indeed,
> failure to register the USTs and maintain correct contact information may
> harm [the Fund] financially.  Notably, the fees established under
> Section 705 [of the Act] are set on an actuarial basis and reviewed annually
> in order to provide an amount sufficient to pay outstanding and anticipated
> claims against [the Fund].  The fees are set by regulation and the monies
> collected are maintained in [the Fund] for the payment of eligible claims and

administrative expenses. [The Fund] depends on the payment of these fees in order to maintain its solvency.

> If tank owners were required to register their tanks only in the event of a release giving rise to a claim, DEP's data would be skewed, leading to faulty fee revenue projections that could jeopardize [the Fund's] ability to pay claims and maintain financial stability.

(*Id.* at 32-33 (citations omitted).)  For these reasons, the Board maintains that "it was error for the Commonwealth Court to reject the Board's determination and to instead conclude that, because [Section 503] registration fees are deposited with DEP rather than [the Fund], a failure to comply with the registration requirement would not impact [the Fund's] solvency." (*Id.* at 33.)

In response, the Shroms argue that the Fund's rule regarding the timing of the payment of the Section 503 registration fees is an *ultra vires*, *de facto* regulation that "has no discernable legal basis, addresses no public policy concern, and is in direct conflict with the General Assembly's stated aims." (Shroms' Br. at 16.)  They suggest that the Board's "position [to the contrary] is not rooted in any statutory text, any codified regulation, or any court decision," but rather, "is rooted in something more primal— deference and discretion." (*Id.* at 3 (internal quotation marks omitted).)  The Shroms point out that, while the Board acknowledged in its Adjudication and Order that the Fund's denial of the Shroms' claim was not based on any specific eligibility criteria set forth in Section 706 of the Act or any associated regulation, the Board continues to maintain before this Court, as it did before the Commonwealth Court, that the unambiguous language of the statute must be given effect.  In the Shroms' view, however, the "clear and unambiguous requirements of the Act and the regulations promulgated thereunder do not contemplate disqualification of a claimant from Fund coverage if [the Section 503] registration fee[s are] outstanding when the underlying release is discovered." (*Id.* at 4 (internal quotation marks omitted).)

Turning to the Board's reliance on DEP's regulations pertaining to the registration of USTs, the Shroms maintain that, contrary to the Board's suggestion, they were in full compliance with Sections 245.41 and 245.42 of DEP's regulations at the time that the release was discovered. In that regard, the Shroms contend that "[t]he stipulated evidentiary record establishes [that they] never received any 'invoice' or other notice that [the Section 503] registration fee[s were] outstanding until after they had notified DEP [that] they intended to remove the [USTs], after the release was discovered, and after they submitted their claim to [the Fund]" and that they paid the Section 503 registration fees immediately thereafter. (*Id.* at 5.) The Shroms further contend that, even if they did violate Sections 245.41 and 245.42 of DEP's regulations, the consequences thereof are not disqualification from Fund coverage for remediation costs, but rather, pursuant to Section 503(b) of the Act, an assessment by DEP for the costs incurred to remediate any release. The Shroms further highlight, however, that Section 503(b) provides an owner/operator with a statutory defense, under which he/she/it can defend against any such enforcement action by demonstrating that the USTs at issue were registered in a prior year. The Shroms suggest that "[i]t surely would be odd for a claimant to defeat a DEP assessment for remediation costs by invoking a prior tank registration . . . , only to be ineligible for Fund coverage . . . anyway" and that, "[i]n that iteration of the universe, no one [would be] responsible for remediation costs." (*Id.* at 6.) The Shroms also take issue with the Board's reliance on *Bergey*, noting that *Bergey* "does not appear to have been cited to by a single court, anywhere, ever," that the statute analyzed under *Bergey* was repealed in 1988, and that *Bergey* is "utterly irrelevant." (*Id.* at 7.)

The Shroms further argue that, while *MH Davis* may have answered the question "as of when" the Section 705 fees must be paid in order to meet the eligibility requirement set forth in Section 706(2) of the Act, *MH Davis* and this case "diverge in two crucial

respects:" (1) the claimant in *MH Davis* did not raise a *de facto* regulation challenge to the Fund's authority to require Section 705 fees to be paid at the time that the release was discovered; and (2) the core concern from *MH Davis*—*i.e.*, the Fund's solvency—is absent in this case because Section 705 fees, unlike Section 503 registration fees, are deposited into the Fund and are used to pay claims for the payment of remediation costs. (*Id.* at 8.)

The Shroms also maintain that, even if you consider the Fund's rule regarding the timing of the payment of Section 503 registration fees an agency interpretation that should be afforded some amount of deference, such rule/interpretation still constitutes a "binding norm [that] has no discernible legal foundation." (*Id.* at 9.) They, therefore, contend that it must be struck down as a *de facto* regulation without consideration of the Board's policy concerns relative to the Fund's financial stability. The Shroms also suggest that, even if this Court were inclined to consider the Board's policy concerns about the Fund's solvency, such policy concerns are "illusory, speculative, belied by the [Board's] own language and inertia, and counterfactual." (*Id.* at 15.) They explain:

> If the claimant is current on Section 705 [f]ees when the underlying release is discovered, there is no financial impact on the Fund because the Section 705 [f]ees are the "premiums" and the "coverage" is thus paid up as of the occurrence date. [Section 503 r]egistration fees cannot change that, and this case illustrates that is so.
>
> If, alternatively, the claimant is not current on Section 705 [f]ees when the underlying release is discovered, there is no financial impact on the Fund because the claimant is ineligible for coverage anyway. Registration fees cannot change that. . . .
>
> Either way, there is no financial harm to the Fund.
>
> And, as noted above, the text of the . . . Act echoes that reality. . . . [Section 503(b) of the Act] gives an owner or operator the ability to defeat a DEP assessment for remediation costs by relying on a tank registration for a "prior year." That statutory text reflects the reality that, if a tank is registered even one time, DEP knows the tank exists, knows where the [t]ank is and will be located ([USTs] do not "move" too well), can account for

the tank, and knows where to send invoices for Section 705 [f]ees. By way of contrast, there is no curative provision in the . . . Act for late Section 705 [f]ees.

Moreover, from a financial perspective, the solvency argument only goes so far. *MH Davis* was decided 21 years ago, 8 years after inception of the Fund. According to the [Fund's] 2017 . . . Annual Report, during calendar year 2017, [the Fund] paid out approximately $33 million in remediation costs. Certainly, that is a massive number. Yet, during the 6[-]month period from July through December of 2017 alone, [the Fund] generated $41.59 million in revenue. [The Fund] is a mature bureaucracy now, having been funded with billions of Pennsylvania taxpayer dollars.

[The Board's] tenuous policy argument is also betrayed by its own phrasing and its own inertia. As reflected by [the Board's] use of speculative language (*i.e.*, "may harm" and "could jeopardize"), the record does not support [the Board's] policy argument. . . .

And, if [the Board] is genuinely concerned about late [Section 503] registration fees impacting the solvency of the Fund, it is inexplicable why the [Board] has taken no steps whatsoever to formally regulate the issue since the Fund's inception in 1994. . . .

Not only is [the Board's] policy argument hollow, it is counterfactual. In the Shroms' case, the [Section 503] registration fee[s] had no effect whatsoever on the Fund. All Section 705 [f]ees were current when the release giving rise to the Shroms' claim was discovered.

(*Id.* at 12-14 (emphasis omitted) (footnotes omitted) (citations omitted).) The Shroms suggest that the real policy concern implicated in this case is the contamination of the Commonwealth's soils by the release of regulated substances from USTs, and that the Fund's rule regarding the timing of the payment of Section 503 registration fees is in direct conflict with the General Assembly's stated aims to remedy any such contamination.

The Shroms further contend that the "materially distinguishable" case law upon which the Board relies cannot "resuscitate [the Fund's] *ultra vires*, *de facto* regulation." (*Id.* at 17.) The Shroms point out that, even if *MH Davis*, *J.D. Pickens*, and *Luther P. Miller* were on point, those decisions do not bind this Court. That being said, with respect to the applicability of *Luther P. Miller*, the Shroms maintain that the Commonwealth Court is "perfectly capable of construing its own jurisprudence." (*Id.* at 18.) They, therefore,

mirror the Commonwealth Court's reasoning as to why *Luther P. Miller* does not control here—*i.e.*, in *Luther P. Miller*, unlike here, the claimant did not challenge the Fund's rule that all Section 503 registration fees must be paid at the time that the release is discovered. The Shroms further suggest, contrary to the Board's criticism, that the Commonwealth Court did address reasoning from both *MH Davis* and *J.D. Pickens*: "the Commonwealth Court pointed out that [the Section 503] registration fees are not deposited into the Fund, that paying the Shroms' claim does not appear to pose any risk to the Fund's solvency given all Section 705 [f]ees [were] paid and that, even if [the Fund's] concern were [sic] legitimate in other cases, that concern must yield in this case to the *de facto* regulation doctrine." (*Id.* at 20.)

The Shroms also take issue with the Board's homeowners' insurance analogy. They explain:

> This situation is not "akin" to a homeowner purchasing insurance coverage for a fire loss after the fire has occurred. The truth, which [the Board] is obfuscating through a poorly conceived analogy, is that all Section 705 [f]ees—*i.e.*, the "premiums"—for Fund coverage were 100% paid when the release was discovered and when the Shroms submitted their claim. Thus, the "coverage" was purchased before the "fire."

(*Id.* at 22 (emphasis omitted) (some internal quotation marks omitted).)

Lastly, the Shroms argue that, while clever, the Board's argument that the Commonwealth Court somehow rejected the Board's finding that UST registration and the payment of Section 503 registration fees is necessary to maintain the Fund's solvency "is premised on a mischaracterization of the Commonwealth Court's decision." (*Id.* at 23.) In support, they suggest that the Commonwealth Court assumed the finding was valid but explained that, if the Fund was truly concerned about claims made in the face of unpaid Section 503 registration fees, then it would be worthwhile for the Fund to promulgate a regulation addressing its concerns. The Shroms further contend that, even if the

Commonwealth Court had rejected such finding, it was well within its authority to do so because such finding is not supported by the record.[6]

### d. Discussion

As this appeal requires us to interpret Section 706(3) of the Act, we are guided in our analysis by the Statutory Construction Act, which provides that the object of all statutory interpretation "is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a). Generally, the plain language of the statute "provides the best indication of legislative intent." *Miller v. Cnty. of Centre*, 173 A.3d 1162, 1168 (Pa. 2017) (citing 1 Pa. C.S. § 1921(b)). If the statutory language is clear and unambiguous in setting forth the intent of the General Assembly, then "we cannot disregard the letter of the statute under the pretext of pursuing its spirit." *Fletcher v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 985 A.2d 678, 684 (Pa. 2009) (citing 1 Pa. C.S. § 1921(b)).

---

[6] In reply to the Shroms' arguments, the Board makes twelve discrete points: (1) the Fund in no way ambushed the Shroms with unpromulgated regulations; (2) the Shroms failed to meet their heavy burden of establishing that they met the eligibility requirements set forth in Section 706 of the Act; (3) the Board has consistently taken the position that the eligibility requirement set forth in Section 706(3) of the Act is unambiguous but, in the alternative, has argued that, if ambiguous, the Fund's interpretation thereof is entitled to strong deference; (4) the Shroms were not in full compliance with the UST registration requirements at the time that the release was discovered because the subject USTs were not, at that time, registered in accordance with Section 503 of the Act; (5) the Shroms mischaracterize the very limited statutory defense set forth in Section 503(b) of the Act; (6) the Shroms inappropriately dismiss the holding from *Bergey*; (7) the Shroms misapprehend *Luther P. Miller*, *MH Davis*, *J.D. Pickens*, and *Bergey*, all of which establish that eligibility under Section 706 is to be determined at the time that the release is discovered; (8) neither the Fund nor the Board enforced a binding norm, but rather, they applied the eligibility requirements set forth in Section 706 of the Act; (9) the General Assembly's requirement that the subject USTs be registered and that the Section 503 registration fees be paid at the time that the release is discovered is not superfluous; (10) the Shroms' characterization that the Fund has been funded by billions of taxpayer dollars is without any basis; (11) the Fund's denial of the Shroms' claim does not contradict the General Assembly's policy concerns as set forth in the Act; and (12) the Shroms' contention that the Board has taken liberties with the evidentiary record is baseless.

In this vein, "we should not insert words into [a statute] that are plainly not there." *Frazier v. Workers' Comp. Appeal Bd. (Bayada Nurses, Inc.)*, 52 A.3d 241, 245 (Pa. 2012). When the statutory language is ambiguous, however, we may ascertain the General Assembly's intent by considering the factors set forth in Section 1921(c) of the Statutory Construction Act, 1 Pa. C.S. § 1921(c), and other rules of statutory construction. *See Pa. Sch. Bds. Ass'n, Inc. v. Pub. Sch. Emps.' Ret. Bd.*, 863 A.2d 432, 436 (Pa. 2004) (observing that "other interpretive rules of statutory construction are to be utilized only where the statute at issue is ambiguous"). Additionally, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage," though "technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in [the Statutory Construction Act] shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa. C.S. § 1903(a). "We also presume that 'the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable,' and that 'the General Assembly intends the entire statute to be effective and certain.'" *Berner v. Montour Twp. Zoning Hearing Bd.*, 217 A.3d 238, 245 (Pa. 2019) (quoting 1 Pa. C.S. § 1922(1)-(2)).

Additionally, the General Assembly, in the Act itself, instructed that the Act must be "liberally construed in order to fully protect the public health, welfare and safety of the residents of this Commonwealth." Section 109 of the Act. With these principles in mind, we begin our analysis by reiterating the statute that we are called upon to interpret. Section 706(3) of the Act provides, in relevant part:

> In order to receive a payment from the . . . Fund, a claimant shall meet the following eligibility requirements:
>
> . . . .
>
> (3) The tank has been registered in accordance with the requirements of [S]ection 503.

In order to be "registered in accordance with the requirements of Section 503," "[e]very owner of [a UST] . . . shall register with [DEP] each [UST] by completing and submitting the form provided by [DEP] and by paying the registration fee prescribed by [DEP] for each [UST] within three months of the effective date of this [A]ct." Sections 706(3) and 503(a) of the Act. Sections 245.41(a) and 245.42(c), (f)-(g) of DEP's regulations provide further guidance regarding when the Section 503 registration fees must be paid to complete a UST registration or to keep a UST registration current or up to date—*e.g.*, upon receipt of the invoice issued after DEP's receipt of a complete registration form, prior to the expiration of the registration certificate, and within 60 days of the date of DEP's annual invoice. *See* 25 Pa. Code §§ 245.41(a), 245.42(c), (f)-(g).

That said, the statutory and regulatory requirements governing the required timing of the payment of the Section 503 registration fees are not, as the Board suggests, dispositive of the issue presented in this case—*i.e.*, *when* the UST registration must be completed and *when* the Section 503 registration fees must be paid to meet the eligibility requirement set forth in Section 706(3) of the Act. Section 503 of the Act and the associated DEP regulations merely answer the question of what a UST owner must do to complete a UST registration or to keep a UST registration current or up to date, not when that UST registration must be completed to meet the eligibility requirement set forth in Section 706(3) of the Act. In other words, while the Board may be correct that Section 503, when read in conjunction with the associated regulations, requires that the Section 503 registration fees be paid by a certain time to complete a UST registration or keep a UST registration current or up to date, there is simply no language within Section 706(3) that requires that the UST registration be completed or the Section 503 registration fees be paid at the time that the release giving rise to the claim

is discovered for a claimant to be eligible to receive payment from the Fund for remediation costs. Section 706(3) of the Act is completely silent on this issue.

With respect to Section 705 fees, on the other hand, Section 706(2) and (5) of the Act requires a claimant seeking payment from the Fund for remediation costs to establish that the "current fee required under [S]ection 705 has been paid" and that "the release that is the subject of the claim occurred after the date established by the [B]oard for payment of the fee required by [S]ection 705(d)." The Commonwealth Court, upon consideration of both of these subsections, interpreted Section 706 to require that the Section 705 fees be paid at the time that the release was discovered for a claimant to be eligible to receive payment from the Fund for remediation costs. *See MH Davis*, 789 A.2d at 401-04. This interpretation is completely consistent with the clear and unambiguous language of Section 706(2) and (5). Thus, as the Commonwealth Court aptly recognized below, if the General Assembly intended for the Section 503 registration fees to be paid at the time that the release was discovered for a claimant to be eligible to receive payment from the Fund for remediation costs, the General Assembly could "have expressly provided as much, as it did with respect to [S]ection 705 fees." *Shrom*, 261 A.3d at 1092.

The Board would, nevertheless, like this Court to blanketly apply the case law addressing the eligibility requirements relative to the payment of Section 705 fees set forth in Section 706(2) and (5) of the Act to the eligibility requirement for UST registration and the payment of Section 503 registration fees set forth in Section 706(3). To do so, however, we would have to ignore both the General Assembly's distinctive treatment of Section 705 fees and Section 503 registration fees in Section 706 and the fact that Section 705 fees and Section 503 registration fees serve two totally different purposes. *See* Section 704(a)(1) of the Act (explaining that Fund is funded by, *inter alia*, Section 705 fees and that Fund is sole source of payment for claims under Act);

Section 503(c) of the Act (explaining that Section 503 registration fees "shall be used to fund the development and operation of the storage tank programs established by [the A]ct").

The Board further suggests that the Commonwealth Court's prior decision in *Luther P. Miller* somehow controls our decision today. While we agree with the Board that the facts presented in *Luther P. Miller* and the matter *sub judice* are substantially similar—*i.e.*, in both cases the subject USTs were not registered and the Section 503 registration fees were not paid until after the releases giving rise to the claims were discovered—we also agree with the Commonwealth Court that *Luther P. Miller* is distinguishable. That is, in *Luther P. Miller*, the Commonwealth Court did not address the precise issue raised herein—*i.e.*, the required timing for the completion of the UST registration and the payment of the Section 503 registration fees to satisfy the eligibility requirement set forth in Section 706(3) of the Act. That was because, in *Luther P. Miller*, the claimant focused its arguments on the inactivity of the subject USTs at the time that the release was discovered. In other words, the Commonwealth Court's analysis in *Luther P. Miller* focused on whether registration of the subject USTs and the payment of the Section 503 registration fees during the time that the USTs were actively in use satisfied the eligibility requirement set forth in Section 706(3), not whether the subject USTs had to be registered and the Section 503 registration fees had to be paid at the time that the release giving rise to the claim was discovered or at some other later time.[7]

---

[7] Even if we were to conclude that *Luther P. Miller* conclusively determined that the subject USTs had to be registered and the Section 503 registration fees had to be paid at the time that the release was discovered for a claimant to be eligible for the payment of remediation costs from the Fund under Section 706 of the Act, which we did not, that decision is not binding on this Court. *See Thomas Jefferson Univ. Hosps., Inc. v. Pa. Dep't of Labor and Indus.*, 162 A.3d 384, 394 (Pa. 2017) (noting that, "although the Commonwealth Court generally must adhere to the binding language of its own opinions, we, as the Supreme Court, are not so bound").

For all of the above-stated reasons, we interpret Section 706(3) of the Act to require that, in order for a claimant to be eligible to receive payment from the Fund for remediation costs, the subject USTs have to be registered and the Section 503 registration fees have to be paid *at any time* prior to the Fund's eligibility determination. This interpretation is consistent with both the clear and unambiguous language of Section 706(3) and the General Assembly's instruction to liberally construe the Act "to fully protect the public health, welfare and safety of the residents of this Commonwealth," Section 109 of the Act, as it will ensure that the money paid into the Fund—in part, the Section 705 fees—are available to remedy the contamination of the Commonwealth's soils that is caused by the release of regulated substances from USTs. This interpretation is also consistent with DEP's actions in this matter relative to the unpaid Section 503 registration fees. We simply cannot ignore that, following the expiration of the subject USTs' registrations due to Tenant's failure to pay the Section 503 registration fees, DEP sent multiple notices to Tenant at the Property concerning the unpaid Section 503 registration fees, DEP referred the debt owed in connection with the Section 503 registration to OAG, OAG sent multiple notices to the Property concerning the unpaid Section 503 registration fees, the Shroms paid the Section 503 registration fees to OAG's collection agent the day after they learned that they had not been paid, and OAG's collection agent, acting on behalf of DEP, accepted the Shroms' payment of the delinquent Section 503 registration fees.

Given that both the Board and the Fund have been acting under the faulty presumption that Section 706(3) clearly and unambiguously requires a claimant to establish that the subject USTs had been registered and the Section 503 registration fees had been paid at the time that the release giving rise to the claim was discovered to establish eligibility for the payment of remediation costs from the Fund under

Section 706(3) of the Act, we must also conclude that the Fund's rule in that regard constitutes a unlawful, *de facto* regulation. *See Transp. Servs.*, 67 A.3d at 153-56. Therefore, to the extent that the Fund wishes to impose an eligibility requirement relative to the timing of UST registration and the payment of Section 503 registration fees in the future, the Board must adopt a regulation to that effect in accordance with the Commonwealth Documents Law as it is permitted to do by Section 706(6).

Lastly, we conclude that, contrary to the Board's assertions, the Commonwealth Court did not summarily reject the Board's finding that the Fund relies on UST registrations to bill the necessary fees that keep the Fund solvent. Rather, the Commonwealth Court, relying upon the differing uses for Section 705 fees and Section 503 registration fees, simply rejected the notion that the Fund's payment of the Shroms' claim would pose a risk to the Fund's solvency. Importantly, Section 705 fees, not Section 503 registration fees, are used to pay claims made to the Fund for the payment of remediation costs under Section 706 of the Act. *See* Sections 503(c) and 704(a)(1) of the Act.

In conclusion, given that the Shroms paid the Section 503 registration fees for the USTs located on the Property before the Fund issued its eligibility determination, we hold that the Shroms established that they met the eligibility requirement set forth in Section 706(3) of the Act. Accordingly, we affirm the order of the Commonwealth Court.

Chief Justice Todd and Justices Donohue, Dougherty and Wecht join the opinion.

Justice Mundy files a concurring opinion.